GEORGE FULLER, APPELLANT, VS. ABBE A. FULLER, APPELLEE.

1. An executrix sold under an order of the County Judge lands of her testatrix, and they were purchased by F., who, under the will, was trustee for himself and his testatrix's daughter. He did not pay the consideration to the executrix. Subsequently the probate of the will was revoked, and he remained in possession and control of the estate of the mother. He and the daughter were the heirs: *Held*, That the daughter upon a bill filed against the father was entitled to an account as to the consideration, and to recover her portion thereof.

2. Another sale of land having been made under an order of the court by the executrix, prior to the revocation of the probate of the will, the father collected the consideration from B., the purchaser, and did not pay it over to the executrix: *Held*, That the daughter was also entitled to an account by the father.

3. The father should be credited in such accounting with the legal expenses of the administration of such executrix and of such sales paid by him before the revocation of the probate of the will.

4. Where two persons, being doubtful as to facts, compromise their rights, the mere fact that they were in error as to the facts does not entitle the party whose duty it was to have known and fur-

nished the other with the exact facts to alter the compromise agreement.

5. It is the duty of a father, if he can, to maintain and educate his child according to her condition and expectations during the latter's minority, even though she have an estate ; but if his means are insufficient, chancery will order an allowance out of her estate for her entire support, or to supplement the father's contribution thereto, according to the circumstances of each case.

6. The child's fortune, and the fortune, condition and circumstances of the father, will be considered in deciding both whether any, and what allowance should be made out of her estate. The welfare and happiness of the child require that she should be educated and maintained preparatory to the advantages and social position which her means will enable her to enjoy, and the whole or any part of the expense thereof will be charged upon her estate, according as the fortune, circumstances and condition of the father require.

7. When the estate of the father is of the same, or about the same value as that of his daughter, and his condition is such that the entire income therefrom is necessary for his own support, the maintenance of the daughter in a style consistent with her own estate will be charged upon her income therefrom, during the period that his own income is necessary for his own support

8. The burden is upon the father to show the necessity for contribution from her estate, and he will be charged with her support during such periods as he does not clearly show the necessity for such contribution.

9. Application should be made in advance for the allowance, and though an allowance for past maintenance will be granted, an inquiry as to granting it will not be directed as a matter of course, but only upon a special case showing good grounds therefor. It will be directed in a suit for an account against the father in possession of and managing her estate, where the pleadings justify it.

10. The general rule seems to be that where a parent applies for allowance for past maintenance the court will consider his means at the time the support is furnished. Where, however, at the time a parent had used the child's means in supporting her and his own means were not then such as to require him, in view of her estate, to contribute to her support, but subsequently thereto, and be-

fore the application by him for an order allowing such use of her means, or the institution by her of a suit for an account of her estate, there had been, pending her infancy, such an increase in the value of his estate as would enable him to reimburse her estate in part or wholly without affecting or imperiling his own support, such reimbursement should be required.

11. Where a part of the estate of the parent is non-productive, and is not used for his maintenance, and the value of such part is so large as to make it seem, in view of his and the child's relative circumstances, unjust to the child that he should hold it free from liability for her support, it should not be ignored in deciding upon his ability to contribute thereto.

12. In stating an account against a father for his child's estate, it is not proper to charge him in the account with any amounts for the maintenance of the child for any period during which he is liable for the child's entire maintenance, nor for any period during which her entire maintenance should be thrown upon her estate. Where part of her maintenance is allowed out of her estate, he should be simply credited with the amount of such allowance; the same result may, however, be reached by crediting him with the whole sum necessary for her maintenance, and charging him with what he is required to contribute out of his own estate for her support.

13. The action of a master and the chancellor, in rejecting claims of a trustee or tenant for improvements and expenditures, or credits for remittances, will not be disturbed unless the evidence clearly shows that it was erroneous.

14. Compensation for individual services in managing or taking care of the joint property is never awarded to a co-tenant, except as the result of a direct agreement, or unless from all the circumstances a mutual understanding to that effect is satisfactorily shown.

15. The computations of interest should be brought up to the date of the master's report, and the decree should be for the aggregate amount reported due, and that this amount bear interest from the date of such report, but interest accruing, intervening the date of the report and the decree should not be made a part of the principal of the decree.

16. Where there is such an insufficiency of testimony as to preclude making a just decree, and the points are covered by the plead-

ings, and are such that there can be no doubt that testimony exists as to them, the cause will be remanded with directions to take further testimony on such points.

Appeal from the Circuit Court for Duval county.

Mrs. Josephine A. Fuller, wife of George Fuller, the appellant, died in Florida in the year 1870, leaving her husband and one child, the appellee, who was a minor.

This suit was brought in the court below by bill filed in 1882 by appellee, by her next friend, against appellant, for an accounting for the property left by Mrs. Fuller at her death, and the income and profits thereof, for a receiver and for other relief.

The other facts of the case are sufficiently stated in the opinion.

*Randall, Walkers & Foster* for Appellant.

*Hartridge & Young* for Appellee.

MR. JUSTICE RANEY delivered the opinion of the court:

I. The second ground of appeal is the finding of the Master that the stock of goods in the appellant's possession at the death of his wife was her property. The answer to the bill of complaint denied that it was. The Master in his report charged appellant with $1,622.43, " half cost of the original stock and half of amount, as shown by letters in evidence, of Mrs. Fuller, that went into the store," and with $1,558.24 interest on the former amount. This being excepted to, the Chancellor sustained the exception and directed the Master to charge the appellant with $900, as one half of the value of the stock of goods, and the Master in his final report, as amended, charged him with this sum of $864.40, interest thereon to July 13, 1882, the day the receiver gave bond and qualified. Nine hundred

dollars is half the value of the stock at the date of Mrs. Fuller's death, July 11, 1870, according to appellant's testimony. The counsel for appellant does not in his brief question the finding that the stock was the wife's property, nor the charge of $900 against his client, so we might consider the ground of appeal as abandoned, but can say, after a careful review of the whole testimony, that we are of the opinion that the stock of goods was her property, and that its value was at least $1,800 at her death.

II. Appellant is charged with $250, half the amount of proceeds of sale of lots 3 and 6, block 110, in Jacksonville, and interest on the same, which it is claimed should not be allowed. The bill alleges that Mrs. Fuller was seised and possessed of this property at the time of her death, and the answer admits that the allegation is true. He testifies that these lots were sold under an order of the court upon the application of Mrs. Abbe, as executrix of the last will and testament of Mrs. Fuller, and that he purchased them for $500, and in answer to the question what he did with the proceeds of the sale, says that when Mrs. Abbe went north in the spring of that year he gave her $400 of it *for the use of his daughter*, and that the other $100 was paid for the administration of the estate according to Judge McLean's bill. As to the $400 he testifies that he does not say it was exactly the same money he got from the lot, but it was on account of the proceeds of the lot. Judge McLean was County Judge of Duval county.

Mrs. Fuller, on the 25th day of December, 1869, executed a last will and testament, attested by three subscribing witnesses, by which Mrs. Abbe was named as executrix, and it was among other things provided that in case of her dying before her husband she left all her property, both real and personal, to him in trust for his own and her daughter's (appellee) use and benefit during his life. It

was admitted to probate in the County Court of Duval county, and letters testamentary issued December 20, 1870, to Mrs. Abbe. The probate of the will was revoked in 1880, the exact time not being given.

It is contended by appellant that not himself but Mrs. Abbe, as executrix, is accountable for the money in a proper suit; that he does not owe the money to his daughter and co-heir, and that she has no right of action against him for it, but that if he owes it to Mrs. Abbe she has a claim against him for it.

If appellant had, as purchaser, paid Mrs. Abbe, as executrix, during the time she was acting as such, $400 as part of the purchase price of the lots, we do not, as advised, say he could be required to pay again or be charged with the $250 and interest, but we are not satisfied from the proof that he made any such payment. The four hundred dollars is not said by him to have been paid to her *as executrix* in part payment for the land. He gave her when she went North $400 of the $500 *for the use of his daughter.* If he, as trustee, gave her this for the maintenance of his daughter, it must have been given to her to expend as custodian of his daughter, and not as executrix, and whether it is a proper credit for her support and maintenance is a different question from that which we are now considering. We are not satisfied that the Master or the Chancellor have erred in their conclusion that no such payment to the executrix of this sum is proven. Novis, Executor, vs. Gamon, Administrator, 70 Ala., 443 ; Wilkinson vs. Searcey, 74 Ala., 243. If Mrs. Abbe were still executrix. the probate of the will not having been revoked and he had not paid, she would be the one to pay to, but as the probate has been revoked, she has no power to collect, and payment to her would be unauthorized. As the sale has

been made, and the purchase price not paid, and the appellee is entitled to half of it, we cannot see why the appellant should not be decreed to pay the appellee the money which she and no one else is entitled to. Moreover, he says in his answer to the bill that up to the revocation of the will he held all the property or estate as trustee under the will, and since the estate has remained in his care, and no one has been appointed administrator, or to whom he could lawfully account.

III. A charge of $750, as half the proceeds of lot 3, in block 97, Jacksonville, and interest from February 27, 1871, $682.68, is also excepted to.

As to this lot appellant testifies as follows : " At the sale of the lot which belonged to the Latimer estate, I bought it in for $900, and was to p .y for titles. My brother-in-law, James M. Johnson, j. ·· ˀˢfor the lot at the sale. I then paid Mr. Johnson $100ˉ in cash myself, also the expenses of the sale. Then my wife and I gave our joint note for $800 to Johnson for balance of purchase money. The note is now in Probate Court, and we both have our signatures on it. I paid the note to my brother-in-law myself out of the proceeds of the sale of the property." He also states that the deed to this lot was taken in his wife's name, and the lot was intended for a homestead, he bidding it off or purchasing it at the sale which he and Johnson attended. The note is not in the record, but is stated to have been introduced in evidence. After Mrs. Fuller's death an order for the sale of the lot was made by the County Judge March 2, 1871, on the petition of the executrix of her will. The bill charges that this lot was sold to Mr. Barrs for $1,900, and that appellant collected the money, and the answer admits the sale to Barrs, but says it was for $1,500. The Chancellor has credited appellant

with $433.51, half the payment of the Johnson note, and $394.49, half interest on payment.

It is argued that appellant is not chargeable in this suit for the proceeds, even if he has them, but that he is accountable therefor to the executrix, and has probably accounted to her, and that she must account as such; that the court has no means of inquiring into the account of Mrs. Abbe, as executrix of Mrs. Fuller, in this suit, and that the bill lays no foundation for it.

As the proceeds of the sale to Barrs came into appellant's hands, and, excepting what he paid on the Johnson note, have remained there, we think that for one-half of the balance left after this payment he is accountable to his daughter. The same result as to the amount to which she is entitled would have been reached by simply charging him with half such balr .,What is said in the preceding paragraph as to the revocation of the probate of the will answers the argument as to appellant not being accountable to appellee, but to the executrix.

IV. A charge of $100, half of the rental of " the store property for the year 1882," is also excepted to. There is upon the record of the testimony taken March 5, 1883, an agreement of counsel for complainant and defendant that the following amounts " are the gross amounts of rents collected by defendant upon the store property on Bay street, described in the bill, for the years stated after Mrs. Fuller's death." The amount stated for the year 1882 is $1,400. Subsequently to this agreement, and on June 26, 1883, the appellant proposed to prove, he being under examination as a witness, that the rents for the year 1882 amounted to only $1,200, instead of $1,400, and that in making the agreed statement of rents for that year he was laboring under a mistake as to the time the property went into the hands of a receiver; that he was mistaken by one month, basing his

statement upon the supposition that the property went into the hands of a receiver in August, 1882. The order appointing the receiver was made July 11th, 1882, and the receiver filed his bond on the 13th of the same month. The Master refused on the ground that appellant was bound by his "admissions heretofore made and agreement and that he had no authority under the order of reference to take testimony as to the rents of the Bay street property."

We regard this agreement as one where neither party pretended to know the exact facts. The appellant, whose duty it was to have kept an exact account of the rents, has not done so; he and appellee, acting through their counsel, have compromised the facts as to them and we see no ground for disturbing the agreement. Adams' Equity, p. 189. Nothing but a mistake by the party who should have kept accurate data is shown.

V. The bill in this case calls for an accounting of the estate of Mrs. Fuller, the wife and mother. It alleges that the appellant is amply able to provide from his own resources for the education and maintenance of appellee in a suitable manner. This the answer denies. The order of reference of January 31st, 1883, directed the Master to make to the appellant all just allowances to which he may be entitled, but made no provision as to charging him with any amounts for his child's support. The Master's original report finds that he was financially able to support his daughter from the death of his wife till the property went into the hands of the receiver. In the order of June 13, 1883, referring the case back to the Master, he is directed to take testimony as to the amount necessary for the maintenance of the daughter, then still a minor, according to the condition and circumstances of *appellant* for each year he may have made remittances to her or to Mrs. Abbe, and for the Master in making up his report to charge appellant

with the amount in each year found to be a necessary and reasonable allowance for her support and maintenance, and to credit appellant with the amount forwarded or advanced by him to the daughter.

If the father's means were during any year such that he is to be charged with his daughter's entire maintenance, then in stating the account of her estate he should not be allowed during such year credit for any sum forwarded or advanced for her maintenance, but the subject should have been entirely excluded from the accounts of her estate. By such exclusion he, so far as her estate is concerned, would have been denied any allowances out of it for her support and education, and thus the expense of such support would, as between himself and her, have been thrown on him.    If, upon the other hand, his condition or circumstances have been such during every year that a court of equity should permit him, in view of her estate, to use the income for her entire or partial support, he should be credited in the accounting with such amount as under the circumstances it would be proper to allow out of her estate, and there should be no charge against him in the accounts where the entire cost of her support is thrown upon her estate.    Where a partial allowance is made out of her estate he should merely be credited with the amount of such supplemental contribution from it ; still the same practical result is had, where only part of the amount which it will take to maintain her is charged to her estate, by crediting him with the whole of the amount allowed for her maintenance, and charging him with the sum which his condition and circumstances enable him to contribute.

It is the duty of a father, if he can, to maintain and educate his child during the latter's minority, even though the child have an estate.    Wellesly vs. Beaufort, 2 Russ., 28 ; 2 Barbour's Ch., 375. But if the father is unable to do

so chancery will order an allowance for the purpose out of the child's estate.

Insolvency or bankruptcy of the parent is not an essential to making the charge upon the child's property. It is for the welfare and happiness of the latter that she should be educated and maintained suitably to her fortune and prospects, and if her father is so straightened in his pecuniary circumstances that he cannot provide for her in this way or style, her own property may be resorted to for the purpose. The amount of the child's fortune, and the fortune, condition and circumstances of the father, including the claims of others upon his bounty, will all be considered in deciding both whether any allowance should be made from her estate, and the amount of it. The good of the child requires that she should be educated and maintained preparatory for the advantages and social position which her means will enable her to enjoy, and the whole or any part of the expense thereof will be charged upon her estate according as the circumstances and condition of the parent require. Schouler on Domestic Relations, § 238 ; 3 Tenn. Ch. R., 502-3 ; Patton's Admrs. vs. Patton, 3 B. Monroe, 160 ; 16 B. Monroe, 292 ; 2 Fla., 360. The insufficiency of the father's means must be shown affirmatively. Hasse vs. Roehrschied, 6 Ind., 66.

In *ex parte* Williams, 2 Collier, 740, where the child of a former marriage had a considerable estate, and the father, whose second wife and a child by such wife were living, and his annual income was £900, and the expenses of his home exhausted his income, the Vice Chancellor allowed £213 a year out of the former child's estate for such maintenance and education, observing that the liberal allowance might perhaps be the means of securing to her comforts in her father's house which she might not otherwise attain, independently of the question of her education and

mere maintenance, which, he thought, might probably absorb the whole allowance.

In the matter of Kane, 2 Barb. Ch., 375, the two children were respectively 9 and 11 years old and had a large estate, and their mother was dead; the father's estate was $25,000 in value, his yearly cash income was $2,500. He alleged that for their proper education and support where they resided, and to fit them to occupy the position in life to which their future prospects entitled them, he had found it difficult to live in a far different and much more expensive manner than he should have considered it necessary to do as a single man and without children, and he asked an allowance for past maintenance, as well as for future support and education. Chancellor Walworth held that if the income of the father did not in fact exceed what he represented, and his children's property was as stated, it would be unreasonable to require him to educate and support them entirely at his own expense.

In the matter of Burke, 4 Sandf. Ch., 669, the doctrine announced is, that the promotion of the permanent interest, welfare and happiness of the infants, rather than an accumulation of their estate will be sought; and that where their income is beyond their absolute wants, and their fortunes large, provision will be made for their living at home with their father, instead of their living at boarding school, although a much greater expense be incurred for the former. The daughters were 11 and 13 years of age. Their mother was dead. Their father was unable to keep house with his own means, with the addition of a board charge for them. Their joint income was nearly $4,000 per year. Their necessary annual expenses at boarding school would not exceed $1,100 to $1,200 a year. The court, with a view to provide them a home with their father, allowed him $2,500 a year out of their income for

the support and education of both, including compensation for charges as guardian. He had married a second wife ; had received $25,000 insurance of the first wife's life ; had paid some debts out of it ; his resources were " moderate," and his income was not more than sufficient to support himself and wife, and was totally inadequate to maintain his whole family in a respectable style and in accordance with his daughters' standing and expectation in life.

In Watts vs. Steele, 19 Ala., 656, where an allowance was made to the father out of the daughter's estate, he having become unable to support her by reason of his poverty and bodily infirmity, it is said " the amount of the father's income, the size of the family dependant upon him for support, and, we might add, his physical inability from disease, &c., to exert himself in providing for them, should be taken into estimate, and if, in view of the circumstances, it should appear as reasonable to make an allowance and for the benefit of the infant, the court will allow it." See, also, Englehards vs. Young's Heirs, 76 Ala., 534.

In Trimble vs. Dodds, 2 Tenn. Ch., 500, Chancellor Cooper holds that a father who is without the necessary means to maintain his children according to their future expectation, or whose income is smaller than that of his children, may be allowed for the future, and under circumstances for their past maintenance.

The application for allowance from the infant's estate should properly be made to the court in advance, and an inquiry as to the propriety of an allowance to the father for past maintenance which at one time was not sanctioned at all, (6 Ves., Jr., 199, 425, 455,) will not be directed as a matter of course, but only upon a special case showing the extent of his means at the time the support was furnished and the particulars of the expenditure for the benefit of the child. 2 Barb. Ch. R., *supra*, *ex parte* Bond, 2 Mylne

& Keen, 440; Trimble vs. Dodd, *supra*; Schouler on Domestic Relations, §238.

The property of the defendant, according to the testimony, consists, or has consisted, since his wife's death, of his half interest in her estate and of the whole of lots 3 and 6 in square 110, in Jacksonville, (since February, 1871,) and of an interest in 63 lots in the town of Ashland, Wisconsin, which have been in the hands of Mrs. Abbe for sale, the title to them never having been in him, but she holding it, and of a tract of land in Marion county, Florida, near Ocala, consisting of about 57 acres, and an interest in homestead of his family in Connecticut. As to the tract in Marion county he is under a contract with another person, by which the latter is to have a half interest in it, or in the grove upon it, upon the completion of the contract to cultivate and tend it, the most of the trees being still young. This tract has increased in value since he purchased, or, as he puts it, the half he sold he got more for than he paid for it. What this sale was is not explained. He borrowed from his sister $1,000 of the $1,265, with which he purchased it, and has paid her only $1,000. He does not give the value of either tract.

As to his income he states in his testimony *that he lived on his mercantile business from his wife's death, July 11th, 1870, until he sold the business in November, 1874.* In 1875 he collected an old partnership claim of his and his brother's which netted him $200, and outside of the rentals from his half interest in the Bay street property of his wife's estate, averaging about $600 net per annum, he has had no other resources or income, this being his average yearly income from July 11th, 1870, to July 13th, 1882. Of his mercantile business, he says in this connection that from January 1st, 1870, to January 1st, 1874, the income from it was not a source of regular profit ; some years it paid and

some years it did not, but was a loss, and he sold because he was losing considerable money ; in 1873 he made no money in the business, but for the first two years after 1870 he made considerable. From 1874 to July 13, 1882, he did not have any sources of income except the Bay street property of his wife's estate. He also says he has not been able to support his daughter, for each year since his wife's death, out of his own income, apart from her income; that from July 11, 1870, to 1876, his income was sufficient for his own support only, as it was from January 1st, 1876, to January 1st, 1879, and from January 1st, 1879, to July 13, 1882. He states that on account of physical inability he did not go into the business again or into any other employment, and has been unable to carry on business for years for this reason.

F. F. L'Engle testifies, August 4, 1883, that the Bay street property is worth $18,000 and the other Jacksonville lots $2,000.

The daughter was a little over six years of age at her mother's death, July 11, 1870. Appellant testifies that in his opinion, judging from what he knows of St. Paul, Minnesota, where she has lived, $250 per year would be ample for her maintenance between July 11, 1870, and 1876, and $300 for the same purpose from January 1st, 1876, to January 1st, 1879. He is charged from July 11, 1870, to December 1st, 1879, at the above rates per annum, and with interest from the end of each year to July 13, 1882. M. A. Fuller, a witness who lived in Minnesota in 1877, at Minneapolis, about nine miles from St. Paul, thinks $250 per annum a just allowance for her support. His daughter is now paying $4 per week for board. He says that in case appellant owns property as indicated by the testimony in this case that $250 per year ought to board, educate and maintain in St. Paul, in a manner suitable to *his* estate, a girl

from 6 to 10 years of age, if she is in good health, and $300 from 10 to 16 years; that from 1870 to 1880 board for a girl in Minneapolis would have been $4 per week, and about the same, he thinks, in St. Paul. This is not testimony as to what witness should be allowed out of her estate for her support in view of her father's condition and circumstances, nor as to what was necessary to maintain the father, or could be allowed by him out of his estate for her support. Board at $4 per week would consume $208 of the $250 or $300. It is true the appellant fixes on the same figures for the daughter's maintenance, but the Chancellor has not restricted her to such limited living; and we cannot consider this statement by the father as evidence that she should not be charged with her own support in view of what he says as to the expense of his own living, and the amount of his own income. John M. Armstrong, a witness for complainant, who left St. Paul in 1870, but has been back there nearly every year since, says that $40 per month from 1870 to 1872, inclusive, and from $40 to $60 for the balance of the period, would be a reasonable cost of such board, education and maintenance, and that it would be $30 for the first three years, $35 for the next three, and $40 for the balance, allowing nothing for education or for care, in the case of a girl worth $10,000 and having a father with an income of $600 per year. This is more in accordance with the Chancellor's views as to what was really a proper amount for her maintenance.

The appellant says he lived on his mercantile business until he sold it in November, 1874. If he did this we think that, during the period between Mrs. Fuller's death and such sale, he should be charged with his daughter's support. It left him the income from his other property to support her. He says nothing as to his business that either clearly overcomes the above statement or justifies us

in concluding that he, in estimating the results of his business, did not include his living upon it as one of its expenses.

His average net income for the remaining years from the the Jacksonville property was about $600. Counsel for appellee *estimates* appellant's estate at $15,000. Mr. L'Engle's testimony relates only to the Jacksonville property, and the record does not show what was the value of appellant's whole estate. This we must look to the appellant to do. He must make a frank and full showing to obtain the aid he seeks. It will not do for him to say he does not know its value. He can find out and the burden is upon him to make this showing. It is clear, however, that his property other than that on Bay street, in Jacksonville, has been non-productive, and his average net income appears to be about six hundred dollars per annum. He says his income has been not more than sufficient to support him and there is no testimony to the contrary. He is a widower, and became so when his daughter was about six years of age. However lamentable may be the misunderstanding between the daughter and father, which has produced this litigation, it cannot be questioned that in placing her with her aunt he was actuated by the best motives and a proper solicitude for her welfare, and acted for her best interests in thus securing her the tender care of a relative of her own sex. The *amount* of the allowances with which he has been credited by the Master is not questioned by her counsel as being in excess of what was proper in view of her estate for her support. If we charge the whole of them, for the period in question subsequent to 1874, upon her own estate, we make no encroachment upon its principal nor do we exhaust her income. Had he kept her with him it is true that her expenses might have been less, but she might not then have had the care of her aunt.

If his net income from 1874 to December, 1879, was only about $600 per annum, and he is required to contribute $300 of this for her support, it leaves him only about $300 for his own support. We are not satisfied that this would be sufficient for his support.    The testimony does not present the facts upon which we can reach an intelligent conclusion as to what amount was necessary for his support.    His is the only testimony upon this point, and he says that $600 is not more than enough; and, moreover, that on account of physical inability he did not go into business again, and has been unable to carry on business for years.    Whether a father has been physically able to do business or to labor during a past period is a fact to be considered in deciding upon what contribution shall be made for his child's support from her estate.    Kinsey vs. State, 71 Ind., 32; Watts vs. Steele, *supra*.    If $600, or whatever his income was, is not more than was enough to support him in his physical condition and he was unable to work, it is clear to our minds that the good of the daughter required that she should be supported from her own income.    Certainly both of them could not be supported in comfort out of his income while she was kept with her aunt.    As no complaint is made of the amount which has been spent on her, it cannot be said to be too much.    Considering her fortune we do not see how less could have been spent in preparing her for the circle in which she will be enabled by it to move.    It cannot be assumed that the amounts remitted for her maintenance have not been so applied.    The action of the Chancellor in allowing them approves them as necessary or proper for her welfare.    To have spent less on her would, we must assume, have deprived her of such preparation, and she would not now be fitted to enjoy the advantages her property will afford her.    No case or principle which we have

found would require a father to dispose of the principal of an estate no larger than was really necessary to his own support, and not materially larger than his daughter's, to secure her such preparation, instead of using her income. Where a part of the estate of the parent is non-productive and not used for his maintenance, and the value of such part is so large as to make it seem, in view of his and the child's relative circumstances, unjust to the child that he should hold it free from liability for her support, it should not be ignored in deciding upon his ability to contribute thereto. The condition and circumstances of the parties should be carefully considered in each case.

The general rule seems to be that where a parent applies for allowance for past maintenance, the court will consider his means at the time the support is furnished; where, however, at the time a parent had used the child's means in supporting her, and his own means were not then such as to require him, in view of her estate, to contribute to her support, but subsequently thereto and before the application by him for an order allowing such use of her means, or the institution by her of a suit for an account of her estate, there had been, pending her infancy, such an increase in the value of his estate as would enable him to reimburse her estate in part or wholly without affecting or imperiling his own support, we think such reimbursement should be required.

We have no doubt of our authority to send this case back with directions that further testimony be taken as to the points upon which, what we have said in this paragraph indicates, that there is such an insufficiency of evidence as to preclude our making a just decree, and our duty to do so seems plain. The points are covered by the pleadings and are such that there can be no doubt that testimony exists as to them. 1 Dan. Ch., 890 ; 2 Dan. Ch., 1366 and

1367 ; Coy vs. Downie, 14 Fla., 561 ; Sharp vs. Taylor, 22 Eng. Chan., 801.

As the result of what we have said under this head all charges against the appellant must be stricken from the account ; the appellant is, moreover, not entitled to any allowance from her estate for her maintenance up to the time of his selling the mercantile business in November, A. D. 1874, and consequently all credits for such maintenance or for remittances therefor during such period must be stricken from the account. As to the maintenance of the daughter for the period subsequent to such sale, and prior to December 1st, A. D. 1879, testimony must be taken as to the value of non-productive property of the appellant not used for his support or maintenance; and testimony must also be taken as to what his expense of living was during such period, and what it should have been for one in the same condition. What the actual amount of his net income from the Bay street property was during such period can and should be reported by the Master from the testimony heretofore taken in the cause. He will be credited with the amounts advanced to or for the daughter during this period, and if it be found that he should be charged with anything for or as a contribution towards her support during it, he may be charged with the same, whatever it may be.

VI. The refusal of the Master to allow appellant credit for the amount of a cost bill paid to the County Judge of Duval county is also excepted to.

This bill is for the probate of will, granting letters testamentary, costs incident to sales of land, and amounts to $71.53. The receipt at the foot of it is dated April 8, 1875.

It is claimed for appellant that if the proceeds of the sales of lots are to be charged to him, he should be credited

with the bill out of such proceeds, and on the other hand it is claimed they are a personal debt of the executrix, and that for aught the court knows, he has never sought to collect it, because he is indebted to her in a much greater sum, and that even if she was suing him for the assets of the estate he could not set off this claim.

The appellant is charged with the proceeds of sales made by the executrix which have come to his hands, and the theory of this accounting assumes a ratification of the sales and acts of the executrix precedent thereto. Pending the duration of her administration as executrix he evidently held the moneys and other properties as trustee under the will; no other conclusion can be satisfactorily drawn from the record, considered as a whole. The bill in question was paid during the period of such administration, and we think it should have been allowed.

VII. It is claimed that $250 sent to his daughter by appellant May 24, 1882, since the commencement of the suit, should have been allowed by the Master as a credit to appellant. He says he sent a draft to her from Scotland for this amount and never received any acknowledgement. This item must follow the disposition made of those covered by what is said in paragraph X.

VIII. He also excepts to the refusal to credit him with $1,200, cost of a brick building erected on the east half of lot 3, block 71, Bay street.

When Mrs. Fuller died there were no improvements on this lot, but a portion of the material was already on the ground, and defendant says that shortly afterwards he went North and bought the hardware, doors, sashes, blinds, &c., according to the plans they had made for the building, and put up the building as " we had understood before my wife's death they were to be erected. * * * There are two buildings on the lot, a front store and a rear warehouse,

containing servants' rooms also. The front building cost $4,700, the rear one $1,200, the inside store work $500. My wife furnished of her own means for these improvements $4,200, and I furnished the remainder." This makes $2,200 as the amount furnished by him. As to what material for building was on the ground at his wife's death, he says: $800 or $900 worth of lumber, which had been bought the fall before, a good many brick; the foundations were laid, which were expensive, as it had to be made of shell. He says the amounts paid out before her death for materials were her money, and that he cannot exactly say what is the amount of bills for material which went into the building, and were paid for by him after her death; he had a bill book which showed, but it "is burnt up;" and that he cannot tell the amount expended by him in the erection of the building after his wife's death without figuring it. It was $2,000, more or less. Has no receipts of the amounts so expended on it; they "are burnt up." Spearing, who was in appellant's employ as a clerk from the spring of 1871 to 1874, says that when he bought out appellant's stock and mercantile business, appellant left his books, insurance policies and other papers with him, and they were all destroyed in the fire with his own; that among them was "a building book," in which was kept the expenses of the buildings of 71 Bay street, but he never examined it particularly.

The Master, in his report, says he has "credited the defendant with one-half of all expenditures made by him in improvements on Nos. 69 and 71 Bay street, Jacksonville, after Mrs. Fuller's death," and in his account we find that he has credited defendant as of December 31, 1870, with $2,600 as half "amount paid for improvements on east half of west half of lot 3, in block 36, (No. 71) City of Jacksonville, after death of Mrs. Fuller," and with $2,398.90, inter-

est on same to July 13, 1882. We are unable to see that this allowance does not cover all that the testimony can be relied on to claim for improvements on this piece of ground, including even the $40 for a driven well.

IX. He claims that he should have been allowed for the care and superintendence of the building, and the amount due by him to Spearing for such services.

Defendant testifies that he had the full superintendence of the whole of the building as the trustee of his wife's will, and had the whole management of the estate as such; superintended the purchasing of all the material, overlooked the building, and made the contracts on number 71; overlooked all the work on the buildings on No. 69, except that he did not furnish the materials, but let that out by contract; that he has managed her property since her death up to the appointment of the receiver and nearly 12 years, and thinks his services worth $400 per year. He spent some of the summer months in Connecticut. Did not employ any one to look after property before he sold stock of goods to Spearing. Spearing, who was in defendant's employ from spring of 1871 to fall of 1874, says he acted as his agent every summer during his absence while in his employ, and then he was such agent until he, Spearing, was burnt out, and then from the spring of 1880 until the commencement of this suit. Defendant says he paid Spearing, for the year 1875, $75 for commissions for collecting rents and taking care of property, and in 1876 $52, and in 1880 $82, and M. A. Fuller $53 for like services that year and the year before, and these are all the commissions that have been paid, and that there is $176.16 due Spearing as commissions for collecting rents up to the time the property went into the hands of the receiver.

The amounts which, according to appellant's brief, should have been allowed under this head, are: $75 for half value

of services superintending erection of buildings, collecting rents, renting and care of property in 1870, and $150 on same account for each of the years from 1871 to 1874 inclusive, and $89.58, half amount due Spearing.

Compensation for individual services in managing or taking care of the joint property is never awarded to a co-tenant, except as the result of a direct agreement to that effect, or unless from all the circumstances of the case the court is satisfied of a mutual understanding between the parties, that the services rendered by one should be paid for by the other. Freeman on Co-tenancy, §260. Here is no such agreement or understanding. Any building constructed after his wife's death was his voluntary act. There is nothing in the case to take it out of the general rule.

As to the sum he says he owed Spearing for taking care of the buildings and collecting rents, we are not satisfied from the testimony that the Master erred in his conclusion.

X. The refusal of the Master to allow appellant certain sums testified by him to have been sent by him to Mrs. Abbe is also assailed.

Mrs. Abbe says as to the period commencing at the time the complainant was placed in her care, and extending up to September, 1874, that she had received from the defendant for the support and maintenance of his daughter about $1,000, and from September 1st, 1874, to January 1st, 1875, she received $250, making an aggregate of $1,250 received up to the last named date. For this period the Master has credited him with sums aggregating about $1,256 principal.

For 1876 he says he sent at least $600 in drafts; he thinks more, and gave her in the same year, at "our house in Connecticut," $100, and also at another time $250, but does not know what she did with it. In reply to the question if he paid this money to Mrs. Abbe for the purpose of his daugh-

ter's support and maintenance, he says: "I cannot tell; I paid her that much money." Mrs. Abbe says she received from him for the support and maintenance of his daughter this year $489.75.

For the year 1877 he says he sent her $600, all in drafts. Upon being asked if he sent it for the support and maintenance of his child he said: "Mrs. Abbe was the executrix, and in the custody of my child, and I sent her the money." Spearing says he sent Mrs. Abbe $157 in the spring of the year, he thinks, as agent for defendant, out of the receipts of the stores on Bay street. The testimony of Mrs. Abbe as to this year is as follows: "For the year 1877 I received $300."

Question. (On cross-examination) How many drafts for money did you receive from Mr. Fuller and Samuel Spearing in the year 1877?

Answer. As near as I can recollect, three.

Question. Do you remember the amount of each draft?

Answer. I think there was one from Spearing for $150.

Question. Did you receive a draft from Mr. Fuller in November or December, for $250, in that year to pay for the same amount of money you borrowed at St. Paul?

Answer. I did not.

Question. Did, or did you not receive from Mr. Fuller two drafts in the winter and spring of 1877, each being for $100, or that amount?

Answer. I did not.

As to the year 1878 he says he sent Mrs. Abbe $800 in drafts that year; sent it to her as he did in previous years. She says she received $572 in drafts, none otherwise. They were either from Mr. Fuller or Spearing, does not remember which; does not remember the number of the drafts or the amount of each. Upon being asked on cross-examination if she received a draft for $172.50, and one for $100,

sent about February 1, and one for $50, sent about March 7, and one for $50 April 8, and one for $100, by A. O. Hussey, sent about April 14, and one for $200, sent about September 12, sent from Windham National Bank, and one for $100, sent by M. A. Fuller, about December 26, she replied that she had no recollection of any particular drafts, or receiving or seeing those from Hussey and Fuller.

As to 1879 he says he sent $600 in the same way as before. She says she received $592.47, and on her cross-examination says she received this amount in drafts; but does not know how many drafts. Upon being asked if she received a draft for $50, sent about January 1, 1879, she says she cannot say, but probably did; and upon being interrogated as to receiving six other drafts of $99.63, $73, $99 63, $99.63, $94.62, $83, sent at stated dates, she said she did not remember.

As to 1880, in answer to the question: How much did you pay for the support and maintenance of your daughter? he says: " $558.66 were sent by me and my sister Jane to my daughter. I know that my sister Jane sent some of this." Mrs. Abbe says that for 1880 she received $498, including drafts turned over to her by the daughter, received by her from her aunt Jane. He says that some of the drafts he sent his daughter were sent through his sister Jane, to wit: 1880, for the following amounts, $60, $40, $83.08, $43, $83.08. He says he sent also in 1880 three drafts for which he received no acknowledgment, one January 4th, for $99.63, on February 24, for $99.87, and on May 2, for $50. These were sent directly to his daughter by mail and were payable to her order; letters and drafts not returned to him.

Upon her direct examination she states that the amounts given by her include all money received by her either in

drafts or currency for every purpose, sent either to herself or the daughter.

Upon her cross-examination, Mrs. Abbe was asked how she knew she had received the amounts testified to in her direct testimony, and replied : " From my bank book and from memoranda."

Question. Have you that bank book ?

Answer. I have for a portion of the time.

Question. Does it show the amounts of all the moneys you received ?

Answer. For the time it purports to it shows all the moneys received.

And on re-direct examination, he says the drafts were mostly New York exchange; that he has tried very hard to get the original drafts, not only here but in Connecticut, but cannot do so because they tell him the most of them have been destroyed, and he learns it is contrary to the custom to return them to the bank where they were issued. He further says the amounts he has testified to are exact amounts for some of the years, and some of them are *from the best of his memory.* The Master allowed appellant for the amounts Mrs. Abbe testified she received, and no more.

We are unable to see that we can reverse the action of the Master and the Chancellor. The burden was upon the appellant to account for the estate. The fact that he could not get the original drafts is no excuse for not producing other evidence of having obtained them from the drawers, or their having been taken up by those on whom they were drawn. His testimony is too unsatisfactory to justify us in reversing the finding of the Master, who had the witnesses before him. The record discloses, moreover, at least a weakness of memory upon appellant's part as to other facts, and particularly the interest of his wife in the mercantile business. It is true that Mrs. Abbe's testimony is

not as definite as it should be. To allow the credits in question would also be to hold that a larger amount was necessary for the daughter's maintenance, and a larger contribution from the daughter's estate for such purpose permissible, than we have indicated. This we are not prepared to do.

XI. Upon the case having been referred back to the Master, we think, in view of the scope of the order, that he should have brought all the computations of interest up to the date of his second report. Merritt vs. Jenkins, 17 Fla., 593. Upon stating the account hereafter the Master will calculate interest up to the date of the report he may file, and the decree will be for the amount of the balance reported due, the same to bear interest from the date of the report, but interest accruing from the date of the report to the date of the decree will not be included as a part of the principal of the decree. Merritt vs. Jenkins, *supra.* Any alleged inaccuracies in computation of interest can be inquired into and corrected if found to exist, even though they have not been pointed out with requisite distinctness.

XII. The decree is reversed and the case will be remanded with directions that the Master re-state the account, and also for further proceedings in accordance with this opinion.

The costs of this appeal will be borne equally by each party.