ADEN E. WATERMAN ET AL., APPELLANTS, VS. REOLA A. HIGGINS ET AL., APPELLEES.

1. By the stringent rule of the common law a conveyance from a husband directly to the wife without the intervention of a trustee is void, but courts of equity refuse to follow, in all cases, this common law rule.   In equity the object to be accomplished and the considerations upon which such conveyances are made will be considered, and if found good and meritorious, and free from imposition and fraud, will be sustained.

2. W. conveyed certain property by deed without the intervention of a trustee to his wife by a second marriage for life, remainder to his minor son by such marriage, upon consideration of natural love and affection and to provide a maintenance for them.   At the time of the conveyance W. was advanced in age, and declared that his reason for making the conveyance was because he had given a due share of his property to his other children ; there being nothing in the record to show the value of the property in the conveyance, or to rebut the statement as to the gift to the other children : *Held*, In a contest between the children of the grantor by a former marriage and the widow and child by the second marriage, that the conveyance is good in equity and will be sustained.

3. A conveyance to a wife for life and at the termination of the life estate to a child then in being as tenant in common with any other heir or heirs of the grantor and the tenant for life, and in default of any other such heirs, to the said child in fee, creates a vested remainder in such child.

A. E. Waterman, et al. v. R. A. Higgins, et al.—Opinion of Court.

4. Mere mental weakness will not authorize a court of equity to set aside a deed, if it does not amount to inability to comprehend the effect and nature of the transaction, and is unaccompanide by evidence of imposition or undue influence.

5. A decree of a Chancellor solely on questions of fact will not be disturbed unless the evidence clearly shows that it was erroneous.

Appeal from the Circuit Court for Orange county.

The facts of the case are stated in the opinion of the court.

*Geo. B. Hodge*, *Foster* and *Gunby* for Appellants.

*Andrew Johnson* for Appellee.

MABRY, J. :

The heirs of Aden Waterman, deceased, by first marriage, filed a bill in the Orange County Circuit Court against his widow and son by a second marriage to set aside and cancel a certain deed executed by said decedent to his second wife for her life and remainder in fee to the son. The second wife, Reola Waterson, to whom the deed was executed during coverture, subsequently married Elijah M. Higgins, and the name of the son by the second marriage is Lewis P. Waterman. The allegations of the bill which set forth the grounds for cancelling the deed are as follows, viz: That about the 12th day of June, A. D. 1876, said Aden Waterman in alleged consideration of the natural love and

affection that he had to his wife, Reola A. Waterman, and in order to provide a sure maintenance for her and the issue of her and his bodies, did sell and convey to the said Reola A. Waterman all of his right, interest, claim or title, either at law or in equity, to what is known as the Clay Springs property lying and being in Orange county, Florida, whether such interest be several or joint, divided or undivided, said place being more particularly described as the place bought by Eliza Waterman from Dr. Hackney ; also all of his real property situate in Orange county, Florida, and described as the NE¼ of the SE¼ of section 36, township 20, south of range 28, east, containing forty acres ; also the SW¼ of the NW¼, and the NW¼ of SW¼ of section 31, township 20, south of range 20, containing in the aggregate one hundred and fifty-eight acres : To have and to hold the said lands to the said Reola A. Waterman for and during the term of her natural life, and after the termination of said life estate, then to the said Lewis P. Waterman in default of other heirs of the bodies of the said Aden E. Waterman and Reola Waterman, and to his heirs forever in absolute fee simple, and in case of the death of the said Lewis P. Waterman without heirs, then to the right heirs of Aden E. Waterman, and their heirs forever ; and which said deed was recorded in Marion county, Florida, on the 12th day of June, A. D. 1878, and in Orange county, Florida, on the —— day of ————, A. D. 18—, all of which will

more fully appear by reference to the certified copy of
said deed herewith filed, marked exhibit "A," and
prayed to be taken as a part of this bill of complaint.
And your orators allege and aver that said conveyance
was invalid and inoperative for vagueness and uncer-
tainty, and was in violation and disregard of the laws
in force in the State of Florida regulating the transfer
and conveyance of title to property, and was in viola-
tion and disregard of the rights of your orators as
heirs at law of Aden Waterman, and is a cloud on
the title of your orators, as heirs at law, of Aden
Waterman, to said property. And your orators
further allege, aver and so charge the fact to
be that at the time of the making of said conveyance
the said Aden Waterman from bad health, mental
trouble and old age was utterly, totally and entirely
*non compos mentis*, insane and without mind or free-
dom of will, and was incapable of making any contract
whatever, or of judging of the proper disposal of his
property ; and they further aver and charge that he
was entirely under the influence and mental control
and volition of his said wife, Reola, and that by her
exclusion of him from the society of his children by
his first wife, and unfair and persistent efforts on her
part to benefit herself and by concealing her machina-
tions from all the rest of his family she induced him to
execute said conveyance in fraud of the just rights and
claims of your orators, much of the said property hav-
ing been inherited by their said father from a deceased

664 . SUPREME COURT.

A. E. Waterman, et al. v. R. A. Higgins, et al.—Opinion of Court.

daughter, who derived her title from the deceased mother of complainants.

Complaints aver and charge that said conveyance was not the voluntary and free act and deed of Aden Waterman, but was procured from him by the fraudulent representations and wicked influence and persecutions of the defendant Reola, and ought to be taken and held as inoperative, null and void, and be cancelled on the record. There are three grounds stated in the foregoing allegations for cancelling the deed: The first is, that the deed was executed in violation and disregard of the laws of the State in force at the time of its execution; the second is, that the grantor, at the time he executed the deed, was *non compos mentis*, and incapable on account of mental imbecility to execute the deeds; and in the third place, that the deed was not voluntarily executed, but that the same was obtained by the fraudulent representations and wicked influence of the wife, Reola Waterman, now Reola Higgins. In connection with the allegation that the deed was executed in violation of law, it is averred that the deed is inoperative for vagueness and uncertainty, but wherein the vagueness or uncertainty exists nowhere pointed out. The allegations of the bill above set out are not entirely correct in reference to the deed in question. From the deed introduced in evidence we are advised that it is a deed poll made direct without the intervention of a trustee from Aden Waterman to his wife, Reola A. Waterman, for and during her natural life. The consideration expressed

in the deed is love and affection, and to provide a sure maintenance for the wife and the heirs of her body begotten by the grantor. The description of the land is, "all my interest, right, title and claim, either at law or in equity, in what is known as the 'Clay Springs place,' situated, lying and being in Orange county, Florida, whether such interest be several or joint, divided or undivided, said place being known more particularly as the place bought by Elza Waterman from Dr. Hackney," and other land in Orange county, described as in the foregoing portion of the bill. The *habendum* clause of the deed is as follows: To have and to hold the aforesaid lands, tenements and hereditaments unto the said Reola A. Waterman for and during the term of her natural life without impeachment of or for any manner of waste, in the use or disposal of the same, or of the rents, issues or profits thereof. And after the determination of said estate for life, then to my infant child, Lewis P. Waterman, as tenant in common with any other heir or heirs of the body of the said Reola by the said Aden Waterman to be begotten, and to their heirs and assigns forever. And in default of other heirs of the body of said Reola A. Waterman by said Aden Waterman, then to the said Lewis P. Waterman, his heirs and assigns forever. And in case of the death of said Lewis P. Waterman without heirs, then after the determination of the life estate in default of heirs of the bodies of the parties hereto, to the right heirs of Aden Waterman. We think there is no uncertainty as to the

intention of the grantor in executing this deed. His purpose was to convey to his wife a life estate, the remainder in fee to his son Lewis, then in existence, and such other children as might be born to him by the life tenant. If no other child or children of the life tenant by the grantor should be born, then the son Lewis was to take the entire remainder in fee, upon condition that if he died without heirs the estate should revert to the other heirs of the grantor in absolute right. At the time of the execution of the deed it was certain that Lewis would take a part of the remainder if he survived the life tenants, and in the event of no subsequent issue he would take the entire estate. Aden Waterman died about three months after the execution of this deed, and Lewis Waterman is the only issue of the marriage of the grantor with Reola. Under the deed in question Lewis P. Waterman now has a vested estate in remainder. Paul vs. Frierson, 21 Fla., 529.

It is alleged first that the deed in question was executed in violation of the laws of Florida. Counsel for appellants say "that the deed was a joint conveyance from husband and wife, and no statute of Florida authorizes it, while the common law expressly prohibits it." As a matter of fact the deed does not purport to be a joint deed from husband and wife, but it is a deed from the husband direct to the wife. The question then presented is whether or not a deed executed during coverture by the husband direct to the wife, without the intervention of a trustee, is of any

validity. The conveyance of the homestead is not here involved. An examination of the authorities on this subject has conducted us to the following conclusions : According to the stringent rules of the common law a conveyance from a husband directly to his wife, without the intervention of a trustee, is void. This results from the unity of husband and wife as established and maintained by the common law. But while such deeds are void at common law, courts of chancery have from an early period refused to follow, in all cases, this common law rule. In equity an examination will be made into the motives, consideration and objects to be accompanied by such conveyances. If made upon good or meritorious considerations, and free from imposition or fraud, they are looked upon with favor and upheld in chancery. In the decision of this case it is not necessary to point out all the cases in which courts of equity will sustain deeds made by husbands directly to wives. It has been stated by some courts that whenever a contract would be good at law when made to a trustee for the benefit of the wife, a court of chancery will sustain the contract when made directly to the wife without the intervention of trustees. Certainly it would be a reproach to a court of chancery to suffer a good and meritorious conveyance to fail simply on account of the absence of a trustee. In order to promote justice and equity the court will provide in such cases a trus-

tee if necessary. The deed before us was made in consideration of love and affection, and to provide a maintenance for a wife and a minor child. The grantor was advanced in years and in feeble health. For some time before the execution of the deed he declared his intention to give the property described therein to his wife and child, and repeatedly stated to his wife and also to his near neighbors that the reason why he wished to do so was because he had given a due share of his property to his other children. The proof does not show the value of the property in question, and there is nothing in the record to rebut the repeated statement of the grantor that he had made liberal donations to his other children. It is said in the case of Moore vs. Page, 111 U. S., 117, that "it is no longer a disputed question that a husband may settle a portion of his property upon his wife, if he does not thereby impair the claims of existing creditors, and the conveyance is not intended as a cover to future schemes of fraud. * * His right to make the settlement arises from the power every one possesses over his own property, by which he can make any disposition of it that does not interfere with the existing rights of others. As he may give it, or a portion of it, to strangers, or for objects of charity without any one being able to call in question either his power or right, so he may give it to those of his own household, to his wife or children. Indeed settlements for their benefit are looked upon with favor and are upheld by the courts. * * In all

cases where a husband makes a voluntary settlement of any portion of his property for the benefit of others who stand in such relation to him as to create an obligation legally or morally to provide for them, as in the case of wife or children, or parents, the only question that can properly be asked is, does such a disposition of the property deprive others of any existing claims to it? If it does not, no one can complain if the transfer is made matter of public record and be not designed as a scheme to defraud future creditors. And it can not make any difference through what channels the property passes to the party to be benefitted, whether it be by direct conveyance from the husband or through the intervention of others." The following authorities are referred to on this point: 2 Story's Equity Jurisprudence, sec. 1380; Shepard vs. Shepard, 7 Johnson's Chy., 57; Hunt vs. Johnson, 44 N. Y., 27; Sims vs. Rickets, 35 Ind., 181; Dale vs. Lincoln, 62 Ill., 22; Deming vs. Williams, 26 Conn., 226; Jones vs. Clifton, 101 U. S., 225; Wells vs. Wells, 35 Miss., 638; Maraman's Administrator vs. Maraman, 4 Met., (Ky.), 84; Burdeno vs. Amperse, 14 Mich., 91; Schouler on Domestic Relations, sec. 189 et seq.

Not only will a court of chancery refuse to cancel a deed direct from the husband to the wife, where he is in a situation to make a gift to her and conveys a reasonable portion of his property for her maintenance, but such conveyances are regarded in equity with favor and are sustained where they do not interfere with existing rights, or constitute a scheme for future

frauds. It is not contended that the conveyance in question had the effect or was designed to defraud creditors of the grantor. The contention is between the children of the grantor by his first marriage, and his widow and child by a second marriage. Our conclusion is, that the deed from Aden Waterman to his wife will be sustained in chancery unless one of the other grounds alleged for the setting it aside be sustained. The result here reached is based upon the doctrines of a court of chancery applicable to such cases and independent of any statutory enactment in this State. The second section of the act of 1845 provides that married women may hereafter become seized or possessed of real and personal property, during coverture, by bequest, demise, gift, purchase or distribution, subject to the provision that such property shall remain in the care and management of the husband. This was an enabling statute passed to secure certain rights to married women, and there are no restrictions expressed in it as to the persons from whom the married women may acquire property. A question may arise, even in a court of law, whether or not the incapacity of a married woman to accept a deed direct from her husband has not been removed by this statute. But the proceedings here are in chancery, and as before stated, our conclusions are based upon the rulings of such a court independent of any statute.

The other grounds for setting aside the deed present questions of fact. Reversing the order in which they

are stated above; we will first consider the third ground, namely, that the deed was not the voluntary act of Aden Waterman, but was obtained from him by the fraudulent practices and wicked influence of his wife, Reola. From the testimony before us we have no hesitancy in deciding that this ground is not sustained. Mrs. Higgins says that her husband told her before they were married that he intended to give her the Clay Springs place, and upon the birth of their child, Lewis, he promised to give his property to both of them. Several of Waterman's neighbors testify that he often declared his purpose to convey this property to his wife and child. There is no testimony in the record that will authorize us in concluding that Mr. Higgins, then Mrs. Waterman, used improper influences in securing the deed from her husband.

The remaining ground alleged for setting aside the deed is that the grantor was, "from bad health, mental trouble and old age, utterly, totally and entirely *non compos mentis*, insane and without mind, or freedom of will, and was incapable of making any contract whatever, or of judging of the proper disposal of his property." We have already reached the conclusion that in a court of chancery the consideration for the conveyance from Aden Waterman to his wife is meritorious and looked upon with favor by this court, and further, that no fraud or undue influence is shown to have been practiced upon him to obtain the deed. The case, therefore, is not affected by considerations of un

due influence practiced upon a person of weak mind, or where a deed is obtained from such a person upon a grossly inadequate consideration.    The sole question is, did Aden Waterman, at the time he executed the deed, have sufficient intelligence to understand fully the nature and effect of the transaction ?   And in the determination of this question it must be kept in mind that mere mental weakness will not authorize a court of ·equity to set aside an  executed contract if it does not amount to inability to comprehend the contract, and is unaccompanied by evidence of imposition or undue influence.    Greer vs. Greers; 9 Grattan, 330 ; Aiman vs. Stout, 42 Penn. St., 114; Graham vs. Pancoast, 30 Penn. St., 89-99 ; 1 Devlin on Deeds, secs. 68, 69.   The burden, then, was upon appellats to show that there was no intelligent execution of the deed in question by their father, Aden Waterman.   The proof shows that the deed was executed on the 12th day of June. A. D. 1878.    It does not appear how old Mr. Waterman was when he executed the deed, though enough is shown from which we can reasonably infer that he was an old man. It is quite evident that he was at the time in feeble health, and died about three months after the deed was executed.   Four witnesses were examined for complainants, and fourteen for respondents.   Robert Bullock testified for complainants that he had known Aden Waterman for thirty-five years before his death, and during the months of May, June, July, August and September, 1878, his mind was exceedingly weak, almost totally impaired.   Dur-

ing said period, at times, his mind was more active than at others, but at no time during said months was he capacitated to transact business of importance or contract judiciously with reference to the disposition of property. At the time of his death (which is shown by the testimony to have occurred on the 8th day of September, 1878), he was an absolute imbecile, wholly incapacitated to transact or attend to business of any kind. This witness testified further that Aden Waterman and his wife visited his home in Ocala, Florida, the day on which the deed was executed, but they concealed from him their purpose in reference to the execution of the deed. That the day following the execution of the deed Waterman's wife returned to her home twenty miles from Ocala, and left her husband in town, and that he in attempting to return to the house of witness at night lost his way by reason of his mental weakness, and was brought in by a guide, and that witness' house was only one thousand yards from the public square, and that Waterman was as familiar with its location and surroundings as with his own premises when in sound mind. That when he was brought into the house, on being asked about his wife, said he had no wife, and that it was with difficulty he could be convinced that he was married. He further testified that Waterman remembered nothing of his old friends in Ocala with whom he had lived from boyhood, and in the opinion of witness he was a total

43

mental wreck, and did not remember executing the deed to his wife on the preceding day. That Waterman remained at witness' house several days, and during this time was childish, incoherent, and seemed to have no lucid intervals. The special acts and conduct of Mr. Waterman, about which the witness speaks, occurred on the day after the deed was executed. A. J. White, one of complainants' witnesses, testified in substance that he had known Aden Waterman about twenty years, and intimately for twelve years. That during the months of May, June, July and August, 1878, he had no mind, and was nothing more than a child. That he had business with Waterman, and found that he could not understand or comprehend at all. At various times for several years before his death when he would go to Mr. Waterman's house he would frequently not know witness, and that on Waterman's return from Ocala the time the deed was executed, witness heard unusual blowing of the boat whistle, and on going to the landing, found Waterman in charge of the captain of the boat. That the captain asked witness to take care of Waterman, and witness found him crazy, and seemed to have no mind. This witness did not consider Waterman capable of executing the deed. Jeff. Driggers, another witness for complainants, testified that he had known Waterman for six or seven years before his death, and that he would at times during the months of May, June, July

and August, 1878, recognize witness when he saw him, and at other times he would not know him. His mind during this time was very much impaired, almost wholly gone. At the time of his death his mind was about gone. This witness says that he accompanied Mr. Waterman and his wife to Ocala the time the deed was executed, and on the way he seemed to have no judgment or reason. That when he passed the residence of Dr. Myers, his family physician, who had known him intimately, he asked who Myers was, and seemed to be unable to comprehend that he ever knew him, and that many other such acts occurred on the way, to show his weak mental condition. That when they got to Ocala Mrs. Waterman asked witness to go up town and get some whisky for Mr. Waterman, and on his return to the residence of Col. Bullock, where they stopped, Mr. Waterman did not know witness, and took him for a colored man who worked at Col. Bullock's. This witness further testifies that he lived near Mr. Waterman before he died, and had many opportunities to see him, and from frequent intercours with him he did not hesitate to say that he was almost wholly incapacitated to attend to any business for some time before his death, or to make any disposition or his property that would require the exercise of judgment or discretion. Dr. T. J. Myers, the fourth witness for complainants, testified in substance as follows : That he had known Aden Waterman for over twenty years, and for four or five years before his death he

was his family physician ; that during the months of
May, June, July, August and September, 1878, Water-
man was *non compos mentis*, and unable to attend to
business or make disposition of his property. This
witness says he visited Mr. Waterman frequently dur-
ing the months of May, June, July and August, 1878,
and invariably found him without mental capacity,
and that his weakness of mind dates from an attack
of congestion of the brain in 1874. That when Water-
man and wife were on their way to Ocala to execute
the deed, they and Driggers remained all night at his
house, and Waterman's mind was no better then, and
he regarded him as *non compos' mentis*. That in the
months of August and September, 1878, he found Mr.
Waterman in a room in his house to himself with no
clothes on, and so weak that he could not get back
into the bed, on falling out. That he would tear his
clothes off his person, seemed to have no reason, and
was perfectly helpless. There is a conflict as to a por-
tion of Dr. Myers' testimony. Mrs. Higgins, formerly
Mrs. Waterman, says that Dr. Myers did not attend
her husband professionally during the year 1878, was
at her house but once in that year, and then to see the
child, Lewis. She produces a medical bill made out
by Dr. Myers against Aden Waterman, and on it visits
are charged for 1876 and 1877, but none for 1878. Mrs.
Pendarvis, who lived with Mr. Waterman during the
months of May and June, 1878, testified that Dr.
Myers was at the house of Mr. Waterman but once
while she lived there, and then to see the child, Lewis.

Driggers, who accompanied Mr. and Mrs. Waterman to Ocala, says nothing about staying all night with Dr. Myers, but does say that when they passed the residence of Dr. Myers, Mr. Waterman asked who Myers was. For the respondents the attorney who drafted the deed, the officer who took Mr. Waterman's acknowledgment, a physician who specially examined his physical and mental condition, and many of his near neighbors who were intimate with him, and who transacted business with him, were examined. We will not undertake to give a synopsis of the testimony of all these witnesses, as it would extend this opinion a considerable length. It appears from the evidence that Mr. Waterman formed the purpose to give the property in question to his wife some time before any question arose as to his mental condition. Mrs. Waterman and one other witness testify that he stated before his last marriage that he intended to give this property to his wife in the event of marriage. Several witnesses say that Mr. Waterman stated in their hearing not long before the deed was executed that he intended to convey this property to his wife and child, and the reason he assigned for doing so was because he had already made liberal donations to his other children. There is nothing in the record to show that he had not done so. For some time before his death, and up to the time the deed was executed, Mr. Waterman was engaged in a mercantile business, and conducted it without the aid of a clerk. When he was sick his wife says she helped him. Some eight or ten

of his near neighbors who traded with him and exchanged country produce for goods, testify that he transacted business in an intelligent way. Some say, at times, he was out of his mind, but at other times he was as rational as anyone. One witness, Robert Fort, who had known him for twenty-two years, says that "a few days before going to Ocala to make over his property to his wife and child he asked me with good sense, who was a careful person that he could get to go with him to Ocala; that his animal was wild, and he was afraid he could not manage her. I recommended Jeff. Driggers, who did go with him. Capt. Waterman said to me that he was going to give his property that he then owned to his wife and baby; that his baby was not raised nor educated, and he wanted them to have it for that purpose." He rode twenty miles in a conveyance to the county seat, stopped at the residence of Col. Bullock, who married his daughter, sent for an attorney and gave him specific instructions about preparing the deed. The attorney says that at the time Aden Waterman gave instructions about how to draw the deed he seemed to be very feeble, and lay on a bed, but he saw nothing to indicate a want of mental capacity. The deed was prepared and the next day Mr. Waterman went before the clerk of the Circuit Court and acknowledged it. The clerk says that while Mr. Waterman appeared physically weak, he readily answered all questions properly asked him about the acknowledgment of the

A. E. Waterman, et al. v. R. A. Higgins, et al.—Opinion of Court.

deed, and there was no apparent defect about his mind at the time.   Dr. T. P. Gary, who knew Mr. Waterman for twenty years before his death, testified that he examined his physical and mental condition, he thinks, in the month of June, 1878.   Mrs. Higgins says the examination by Dr. Gary was made in July, 1878. Dr. Gary says that physically he (Waterman) was rather debilitated, mentally he was strong and intellectual.   In the opinion of this witness he was fully able at that time to discharge any ordinary business and dispose of any property he desired.   This purpose of Aden Waterman to convey his property to his wife and child, formed undoubtedly when his mind was clear and vigorous, he carries out in an intelligent way by directing a deed to be drawn in accordance with his wishes, and then executes it in the usual way before the proper officer.   On final hearing the chancellor dismissed the bill.   A decree solely on questions of fact will not be disturbed unless the evidence clearly shows that it was erroneous.   Fuller vs. Fuller, 23 Fla., 236.   On the evidence before us we are unable to say that the decree was erroneous.

The decree dismissing the bill is, therefore, affirmed.