JACOB KAHN, APPELLANT, VS. JAMES WILKINS ET AL., APPELLEES.

1. Deeds of conveyance and bills of sale entered into for the purpose of defrauding creditors are valid as between the parties thereto, and such instruments vest title absolutely in the grantees, subject to impeachment only by the persons defrauded by such transactions.

2. A party who has conveyed by bill of sale his goods for the purpose of defrauding his creditors can not be permitted in a court of justice to question the sale, although it appear that no consideration was received therefor.

3. K. conveyed his stock of goods for the purpose of defrauding his creditors to W. under an arrangement that the latter, for a consideration, should assume nominal control of the business and permit the same to be carried on in his name, but the business and property employed therein to belong to K.; the business was conducted under such arrangement for about two years, when a new arrangement was entered into, as claimed by K., by which the business was to be continued in the name of W., and in consideration of which and for personal services to be rendered by him he was to receive one-half of the profits of the business: *Held*, That K. was in no situation to maintain a bill against W. for an account, even if such new arrangement was made, where it appeared that such new arrangement was a continuation of the same scheme to defraud K's creditors who had not been paid their just claims.

Appeal from the Circuit Court for Escambia county.

The facts in the case are stated in the opinion of the court.

*John C. Avery*, for Appellant.

*Blount & Blount*, for Appellees.

MABRY, C. J.:

Appellant was complainant in the Circuit Court, and alleged in a bill filed originally against appellee, James Wilkins, that complainant was on the 28th day of March, 1886, the owner of a stock of merchandise in the city of Pensacola of the value of several thousand dollars, and about that time entered into an arrangement with defendant by which the latter, for a consideration paid and to be paid, was to assume nominal control of the business and permit the same to be carried on in his name, with the distinct understanding that the business and all the property used therein belonged to complainant; that the business was accordingly carried on for about two years in defendant's name, he making no claim of interest in it, or expressing any desire to acquire an interest therein, but conducted an entirely different business of his own in said city; that during said time complainant was the exclusive owner of said business, paid all expenses of conducting the same, including rents and clerk hire, replenished the stock when necessary, and received at the close of each day the funds collected from sales made; that in the month of October, 1887, defendant abandoned the business in which he was engaged, and expressed a desire to make some arrangement with complainant by which he, defendant, could earn a livelihood, and that the business should be continued in his name, in consideration of which, and services to be rendered by him therein, he should receive one-half of the profits thereafter to be earned; that accordingly it was agreed between them that defendant should go into the store, assume direction thereof and receive one-half of the profits thereafter to be earned, but with the distinct understanding that he acquired no property in the goods or business, and that it should continue in all other respects as before; that on the day

after making said arrangement defendant moved into
the store an iron safe, and on the second night placed
therein the money received during the day, and in-
formed complainant that he would turn over the money
weekly; that at the end of each week thereafter for
about one month defendant delivered to complainant
one-half of the proceeds of sales, and retained the
other half without reference to profits, and then stopped
delivering any money to complainant, alleging that he,
defendant, wanted the money to buy a Spring stock
of goods; that complainant from time to time sent
creditors of the business to defendant for payment, but
he refused to pay them, stating to them that he owed
complainant nothing, although he had at the time large
sums of money belonging to complainant; that this state
of affairs continued until about September, 1887,
when the business became embarrassed and credi-
tors became clamorous for payment, but defendant
refused to pay or deliver to complainant his
money; that defendant then advised complainan-
to borrow money to pay the debts which he owed to
said business, and accordingly complainant borrowed
from defendant's brother two thousand dollars, and
one thousand from another party, giving mortgages
on real estate not in said business to secure the loan,
and the money so borrowed was paid by complainant
to the creditors aforesaid; that thereafter defendant
continued in the same course of conduct towards the
complainant, excluding him from any participation in
the business, from any control thereof, and from any
possession and use of the moneys therefrom until
about the month of April, 1888; that complainant all
the while hoped that he would eventually obtain an
amicable settlement with defendant, and a return of
his property after a just accounting between them,

but that on a certain day in April, when complainant had gone to the store to make a final settlement and induce defendant to abandon his outrageous course of conduct, he, complainant, was in a violent and insulting manner turned out of the store by the defendant, and put in fear of personal violence should he again endeavor to obtain possession of his property; that complainant was still deprived of his property by defendant, who claimed that it belonged to him alone, and he was using it in conducting a business as a merchant in disregard of the rights of complainant; that defendant put nothing in the business except his services, and has no claim upon it except to the extent of one-half of the profits thereof since October, 1887. The value of the stock at the time defendant took charge of the business is alleged to be $15,000, and that he has not accounted therefor, or the receipts or profits thereof, except as stated, and the course defendant had pursued had rendered it impossible for complainant to know what goods were in his hands, what sales had been made, or what profits had accrued, and that it was impossible for them to continue the business under the arrangement made, and the same should be closed up at once, and the accounts between them adjusted and settled. The bill prays for an accounting, an injunction, a receiver and for process.

The defendant, James Wilkins, answered the bill. The alleged arrangement in March, 1886, in reference to the nominal control of the business in the name of the defendant is denied, and the defense set up is that the defendant bought the stock of goods outright at that time, received possession of the same and became the absolute owner thereof. The circumstances attending the alleged purchase, the consideration there-

for and the consummation of the same by bill of sale, receipt of the purchase price and delivery of the goods are set out in detail. '

Some of the allegations of the bill are admitted to be true, some are admitted to be literally true, and explained, but every material allegation in the bill irreconcilable with the alleged defense that defendant bought the goods outright and paid for them in March, 1886, is positively denied. The alleged arrangement of October, 1887, is specifically denied, and it is stated that no such arrangement, or anything like it, was agreed upon between the parties. The borrowing of the money by complainant on mortgage security and putting it into the business is denied, and it is alleged that defendant borrowed the money himself. The refusal on the part of defendant to permit complainant to share in the business, or any part of it, is conceded, and it is denied that he has any interest in the same. Replication was filed to this answer. An application for an injunction and receiver was denied.

Subsequently a supplemental bill was filed adding J. D. Wilkins and Charles P. Bobe, partners under the style of J. D. Wilkins & Co., as defendants. The original bill is repeated, and after reciting the filing of the answer by James Wilkins and refusal of a motion to grant an injunction and appoint a receiver, it is alleged in the supplemental bill that James Wilkins pretended to sell the stock of goods to J. D. Wilkins and Charles P. Bobe, and they claimed to own the same. It is further alleged that the latter were without means to make such purchase, and could only have done so on a credit or by means acquired by loan for that purpose, and that if they did in fact make such purchase, they did so with full knowledge of complainant's rights. The grounds upon which

knowledge on their part is based are set out in detail, and it is further alleged that the sale and purchase were for the purpose of hindering and delaying complainant in obtaining relief, and that they were void.

Another application for injunction and receiver was made and certain orders made thereon, but as no question affecting them is presented on this appeal, they need not be specially mentioned.

Testimony was taken, and on final hearing the bill of complaint was dismissed and complainant appealed.

Our conclusion is, that on the testimony before us the decree appealed from should be affirmed. The testimony is too voluminous to be set out in an opinion, and we will state our conclusions based upon it, and refer to such portions as have a special bearing upon the conclusion reached.

From the testimony of appellant, who was complainant in the Circuit Court, it appears that he made a sham sale, for the purpose of defrauding his creditors of the stock of goods in question, to appellee. The proof of this fact, as shown by appellant's testimony, is clear and positive. He testifies himself that he requested appellee to accept a bill of sale for the stock of goods for the purpose of saving it from creditors, and that in pursuance of this arrangement a bill of sale in due form, reciting a consideration of four thousand dollars, was executed and delivered in the presence of witnesses. The bill of sale is in the record, produced by appellee, and bears date the 26th of March, 1886. When the bill of sale was delivered, appellee, in the presence of the subscribing witnesses, handed to appellant his three promissory notes, each for one thousand dollars, payable to appellant, and

also one thousand dollars in money, making the consideration expressed in the bill of sale. Appellant swears that the notes were not genuine, and were prepared for the purpose, and that the money was subsequently returned to appellee ; and, in fact, that the entire transaction, although conducted in the presence of others as genuine, was a sham, and intended for the purpose stated.

The testimony of appellee is in irreconcilable conflict with that of appellant as to the *bona fides* of the sale, but as our view is that appellant is in no condition to recover on the showing made, it is not necessary that we state whether or not we are prepared to accept appellee's contention that the sale was genuine. It is an established rule of law that all deeds, conveyances and bills of sale, entered into for the purpose of defrauding creditors are valid between the parties, and such fraudulent conveyances vest title absolutely in the grantees and secure to them a perfect estate, except as to those persons actually defrauded by the transaction. Bellamy vs. Bellamy, 6 Fla. 62; Whitworth vs. Thomas, 83 Ala. 308, 3 South. Rep. 781, S. C. 3 Am. St. Rep. 725 and notes; Wait on Fraudulent Conveyances and Creditors' Bills, sec. 395.

If appellant sold and conveyed his stock of goods for the purpose of defrauding his creditors, he, of course, can not be heard in a court of justice to question the sale, although he may not have received a cent for the transfer. Counsel for appellant does not question the existence of the rule of law stated, but he insists, as we understand, that as a matter of fact there was no delivery of the goods at the time the bill of sale was executed in March, 1886, and that appellant remained in possession thereafter as he had been before. His contention, based upon such state of facts,

is that although the bill of sale was executed for the fraudulent purpose mentioned, the sale was not consummated without actual delivery of the property, and that if the vendor remained in possession after sale, the fraudulent vendee could not recover possession. Following up this contention it is further insisted that in October, 1887, another arrangement was entered into between the parties, whereby the appellee was to assume control of the business in which the stock of goods was employed, and in consideration of services to be rendered and management of the business, he was to receive one-half of the profits thereof, without any interest whatever in the stock itself. This new arrangement is claimed to create a partnership, or some relation of trust in the nature of a partnership between the parties, and that under such arrangement an accounting can be had in equity between the parties. The principle announced in Crescent Insurance Co. vs. Bear, 23 Fla. 50, 1 South. Rep. 318, that where in an illegal venture profits have been made, an accounting may be had in equity by one partner against another who has them and is seeking to appropriate them to his individual use, is invoked. On the point of the delivery of the goods in March, 1886, the parties are again in irreconcilable conflict in their allegations and proofs. Appellant states that when the sham sale had been gone through with in a room removed from the building in which the goods were located, he and appellee went to the said building and made it appear to the clerks that appellee was owner. The business was admittedly conducted in the latter's name, and a sign with his name alone on it was put in front of the building. While all this is admitted to be true, appellant's testimony is to the effect that he still retained control of the store, purchased goods to replen-

ish the stock, paid the clerks their wages, discharged the rent for the building and received daily the cash from the sales until October, 1887, and was in fact owner. Appellee's version of the transaction is, that the store and goods were put in his possession by appellant in the presence of the clerks, the keys were turned over to him and he had control of the clerks and the business. It is admitted as literally true that appellant purchased goods to replenish the stock, and received the cash sales realized from the goods daily, but appellee swears that he received the money for the purpose of paying for the goods used in the business. In view of the conclusion we reach on the evidence, it is not necessary that an opinion be expressed on the question of actual delivery of the goods, when the bill of sale was executed in March, 1886; neither do we stop to investigate the right of appellee under the execution bill of sale to possession if it had been denied him. While the courts generally recognize the rule that a conveyance of property in fraud to creditors is good as between the parties thereto, yet in its application some confusion has arisen over the distinction between executed and executory contracts, and to what extent a court will enforce obligations between the parties resulting from such conveyances. The questions suggested are not decided, as it is not necessary to pass on them here. On the evidence before us it is entirely clear that appellee, with the consent of appellant, did have actual possession and management of the property involved in the suit in October, 1887. At that time appellant's creditors had not been paid. Some of them had accepted compromises, but not all, and we are entirely satisfied that there is sufficient evidence to sustain a conclusion of the chancellor that, conceding the arrangement as claimed was made in

October, 1887, it was for the further purpose of shielding appellant's property from the assaults of his creditors.   He does not hesitate to say that he conducted a business in the name of appellee from March, 1886, until October, 1887, for the purpose of defrauding his creditors, and there is much in the evidence, on appellant's own showing, that the arrangement in October, 1887, if in fact made, was for the purpose of further covering up and shielding the property from creditors. It is apparent from the evidence that both parties were apprehensive that attachment proceedings would be instituted against the property, and many precautions were taken to guard against such a contingency.   Appellant swears that in October, 1887, appellee stated to him that he could not then transfer the property to Mrs. Kahn for the reason that it would be attached if the transfer was made, and also said that he (appellee) would like to stay in the store permanently for half of the profits,  no change to be made by him, and the same management to continue.   Appellant says he agreed to this because he could not help himself, as appellee had everything in his own power.   The only power that he could have had over appellant, so far as the testimony shows, existed in the fact that the appellee could throw off the cover and expose the property to creditors. There was no other or different purpose manifested in the new arrangement, and if made it was a continuation of the same scheme to conceal the property from creditors and thereby defraud them.   If such was the case, we have no hesitancy in declaring that appellant was in no situation to call for an account and a return of the property. Stephens vs. Heirs of Harrow, 26 Iowa, 458. The case does not come within the principle of the decision in Crescent Insurance Co. vs. Bear, *supra*, and a careful examination of the evidence satisfies us

that it is sufficient to sustain the decree on the ground above stated.

An order will be made affirming the decree.