MAY F. FISHER, a free dealer, v. DON B. GRADY, *et ux.*

178 So. 852.
Division B.
Opinion Filed December 23, 1937.
Rehearing Denied January 26, 1938.

*W. B. Dickenson* and *Erle B. Askew,* for Appellant;

*James F. Sikes, J. Carl Lambdin, B. K. Roberts* and *H. H. Wells,* for Appellees.

CHAPMAN, J.—The parties to this suit in this opinion will be referred to as they appeared in the court below as plain- . tiff and defendants. On September 25, 1935, plaintiff filed

in the Circuit Court of Pinellas County her bill of complaint against the defendants, alleging, among other things, that on February 20, 1929, May F. Fisher acquired title to the West 50 feet of the Poinsettia Hotel located in the City of St. Petersburg, Florida, and on April 29, 1927, plaintiff's predecessor in the chain of title, Mrs. Roswell M. Marshall, executed a deed of trust to secure the payment of $115,000.00 of bonds against the property. Mrs. May Fisher and Mrs. Minnie Alice Marshall, also known as Mrs. Roswell M. Marshall, are sisters. The 113 feet lying East of the tract involved in this suit is a part of the land upon which the Poinsettia Hotel stands, and the East 113 feet likewise was encumbered by a first mortgage to the Metropolitan Life Insurance Company on the Poinsettia Hotel in the sum of $96,000.00. The hotel property was constructed to be operated as one unit. The East 83 feet contained, on the ground floor, a part of the lobby of said hotel and three store rooms, and three floors above and 64 guest rooms. The West 50 feet, on the ground floor, contained a part of the lobby, the men's wash rooms, elevator, stairs, the basement, the heating plant and two store rooms, including the kitchen of the Coffee Shop, and the electric, plumbing and steam lines.

It was to the mutual interest of the sisters to preserve the ownership and maintain the operation of the hotel property. Don B. Grady was a nephew of the two sisters whom they brought to Florida from Pennsylvania in 1921 and gave employment in said hotel as a Room Clerk until 1924, when he was made Manager of the hotel at a salary of $300.00 per month, and continued in said capacity until October, 1933. The hotel under average normal conditions produced, annually, a large income, with the exception of the depression period. On December 9, 1931, plaintiff became ill and went to a hospital and continued in bad health

until sometime in 1932, or the early part of 1933. The defendant, Don B. Grady, as Manager, operated the hotel, collected rents, income, revenue and profits of the hotel building and commercial houses, and these activities continued during the bad health of May F. Fisher.

It is alleged that Don B. Grady, defendant, induced Senator N. U. Bond to furnish the money necessary to buy at 25 cents on the dollar all the bonds amounting to $115,-000.00 secured by the trust deed involving the West 50 feet for the total sum of $30,000.00, the aggregate amount of the bonds and interest then due came to $130,000.00. It further alleges the existence of a written agreement with the defendant and N. U. Bond, after the purchase of the bonds, to institute a foreclosure on the trust deed, acquire a deed to the property at the Master's sale, and convey the property to the defendant and receive a purchase money mortgage. That part of plaintiff's money was used in refinancing the said property.

Pursuant to the agreement, the Master's deed dated June 30, 1934, was taken by Bond and on the 1st day of July, 1934, N. U. Bond conveyed the property involved in this suit to the defendant and took back a purchase price mortgage in the sum of $33,000.00. The difference of the sum of $30,000.00 paid for the bonds and the $33,000.00 face of the purchase price money mortgage, or the sum of $3,000.00, went to N. U. Bond in the form of a bonus. The plaintiff had no knowledge of the agreement between the defendant Grady and N. U. Bond about the purchase of the mortgage bonds for the sum of $30,000.00, or the taking of title at the foreclosure sale in N. U. Bond, and a conveyance of said property to defendant Grady. The fact that Grady was the agent of the plaintiff, and manager of the hotel, and operating the same for the plaintiff at the time defendant Grady entered into the agreement with N. U. Bond

to purchase the outstanding bonds on the hotel, and the time of taking title in N. U. Bond and the conveyance thereof to the defendant and the defendant's executing a purchase price mortgage to Bond in the sum of $33,000.00, that by operation of law, the defendant to this suit held the title to the West 50 feet as trustee for the plaintiff. The defendant Grady failed to account to plaintiff for moneys collected belonging to her and he is asserting title and claims the ownership of the lands and building in his own right, and not as trustee for plaintiff. The defendant violating his obligations and duties as the agent of the plaintiff in acting against her interest and in taking title to the property under these conditions and circumstances is in law a fraud.

The defendants claim possession and ownership of the West 50 feet of the property and at the time of the filing of the bill, were operating the hotel under an arrangement with the Metropolitan Life Insurance Company as to the East 113 feet; that he has collected profits, revenues and income from the hotel and commercial houses and asserts dominion in his own rights as owner and lessee, while in truth and in fact he has been at all times the agent of the plaintiff, and he has appropriated a large sum of money from these different sources, approximating $25,000.00, and he has been paid $45.00 per week by plaintiff as a salary for several years, and that an accounting of all moneys received by the defendant should be made to the plaintiff. The prayer of the bill is for: (a) a complete accounting; (b) that Don B. Grady be decreed to hold the property as trustee for plaintiff; (c) appointment of a receiver; (d) additional relief in conformity with equity.

The defendants appeared and filed a motion to dismiss the bill of complaint and the record here fails to recite an order made by the lower court on the motion to dismiss,

but the parties and counsel consider the same as having been overruled and denied.

On November 1, 1935, Don B. Grady and wife, Mary Grady, filed their answer under oath to the bill of complaint. The answer denied the plaintiff was the owner of the West 50 feet of the Poinsettia Hotel, but it was owned by her sister, Minnie Alice Marshall, and that he had operated the hotel under a co-partnership agreement between Minnie Alice Marshall and May F. Fisher dated November 1, 1922; that Minnie Alice Marshall, in 1928 and prior thereto, was heavily involved; with numerous suits pending, and judgments had been entered or would be entered against her on her then outstanding obligations under these circumstances and conditions, on October 24, 1928, she conveyed the West 50 feet to the S. & F. Holding Company, and on the 20th day of February, 1929, the S. & F. Holding Company conveyed the property to May F. Fisher, and the conveyance so made was without consideration, and as a matter of law plaintiff held the title thereto in trust for the use and benefit of Minnie Alice Marshall; that May F. Fisher admitted to others the holding of the title involved in this suit as trustee for her sister. The property at the time of conveyance had bonds outstanding in the sum of $115,000.00, bearing interest at 8% and maturing in 1932. That the East 83 feet were encumbered by a $90,000.00 mortgage and that a foreclosure was instituted in the Federal court, receiver appointed, and placed in charge of the property under the suit to foreclose mortgage on the East 113 feet thereof.

The answer denied that the plaintiff operated the hotel in her own right, but averred it was operated by a co-partnership agreement in writing and signed by plaintiff and her sister when the defendant managed the business from 1924 until October 1, 1933, and received a salary of $3,600.00 per year. The answer admitted the plaintiff became ill and

went to a hospital in December, 1931, but denies that she was unable, because of illness, to look after her business affairs; that she did not pay interest, taxes or insurance upon the property and otherwise dissipated the income and assets, and no sinking fund was ever provided to retire the bonded indebtedness and that plaintiff was in bad financial condition and insolvent; that plaintiff continued to reside in the hotel until a receiver was appointed by the Federal courts, when she advised defendant she had no interest in the property, and had no intention to defend the mortgage foreclosure or make any effort to refinance the property, or hold the same, and the defendant was at liberty, not only to operate the hotel, but he could have whatever amount or interest of the mortgaged property salvaged from the mortgaged property, and pursuant to this agreement defendant obtained a lease from the receiver as to the East 83 feet for the season beginning October 15, 1933, and ending May 15, 1934, for a rental value of $2,000.00; that he owned the 50 feet of the hotel and with the leasing agreement from the Metropolitan Life Insurance Company had the management of the property in his own right after October, 1933, and that he was not the agent or manager of the plaintiff and she has no claim or interest in the said mortgaged property, legal or equitable.

The answer recites the effect of the economic depression upon the hotel business in the vicinity of St. Petersburg, and at a meeting in December, 1932, attended by Mrs. Fisher, Mrs. Marshall and the defendant, it was agreed that the property was irretrievably lost and that Don Grady would make an effort to buy up the bonds covering the West 50 feet and secure an extension of the mortgage on the East 83 feet, when the two pieces of property would be conveyed into a corporation wherein defendant would own 51% of the capital stock and the sisters, 49% between them,

and under these terms, conditions and circumstances defendant undertook the raising of the money for the purchase of the bonds on the West 50 feet and an extension of the time of payment of the mortgage on the East 83 feet.

The answer alleges competent, resourceful and conservative management of the property; the abandonment on the part of the plaintiff, which in law amounts to an estoppel; extensive repairs on the hotel with heavy expenditures therefor by the defendant, hard work and constant efforts to place the property on a paying basis, which, coupled with changed business conditions, converted the hotel property from a losing to a profitable enterprise.

The answer had attached to and made a part thereof certain exhibits unnecessary to recite.

On December 7, 1935, Honorable T. Frank Hobson, a Judge of the Sixth Judicial Circuit, under Section 4561, Comp. Gen. Laws of Florida, appointed Honorable M. A. McMullen referee, with all authority conferred under Section 4561, *supra*. The record shows that the referee heard the testimony of Florence Rossiter and plaintiff, May F. Fisher, and on March 26, 1936, the referee made and entered an order appointing Mrs. Maude B. Mitchell as Special Examiner, with directions to take all the testimony offered by the parties and report the same to the Referee.

The record shows a stipulation of counsel of record filed in the cause dated January 15, 1937, designating Hon. M. A. Mullen, Esq., as Judge *pro hac vice* with full power to hear and determine all questions of law and fact, with all the powers of a Circuit Judge, and for this case the said M. A. McMullen shall act as Judge in place of one of the Judges of the Sixth Judicial Circuit. On February 27, 1937, Hon. M. A. McMullen, Referee and Judge *pro hac vice,* on final hearing, held that the plaintiff failed to establish the material allegations of the said bill of complaint and that proof

of the material allegations of the answer of Don B. Grady had been sustained and that there was no legal evidence sufficient in law to support a decree in favor of the plaintiff; "that the equities of the cause were with the defendant," and the bill of complaint was dismissed at the cost of the plaintiff. From this final decree an appeal was taken to this Court, supersedeas order entered and bond given and the record perfected, and on the final decree eight assignments of error are argued here for a reversal of the cause.

It is contended by the defendants that May F. Fisher never owned the West 50 feet conveyed by Minnie Alice Marshall to S. & F. Holding Company and on February 12, 1929, conveyed into plaintiff by S. & F. Holding Company. The financial conditions and circumstances surrounding Minnie Alice Marshall at the time of the conveyance amounted in law to voluntary conveyance and was made only for the purpose of defrauding the claims of creditors. It is true that the defendant was Secretary of the Company at the time of this conveyance. We think this legal conclusion is a sound one, but we are dealing with a conveyance from sister to a corporation and from the corporation to a sister and as between the parties it appears to conform to the law, there being no creditors here complaining. The authorities seem to support the holding that as between the parties to these two conveyances, it meets the requirements of the law. This question is treated in Volume 27, Corpus Juris, page 641, par. 407, viz.:

"TRANSFERS BETWEEN RELATIVES:—The fact that the parties to a conveyance are related to each other either by blood or marriage does not of itself establish fraud in the transfer nor render it invalid, but the fact of relationship may properly be considered in connection with other evidence tending to impeach the transaction; and it is very generally stated that transactions between relatives will be

closely scrutinized, because fraud is so easily practiced and concealed under such circumstances. * * *"

Also 12 R. C. L. par. 104, page 588, viz.:

"RELATIONSHIP OF PARTIES GENERALLY.—Although transfer by insolvent debtors to their relatives have been regarded with some suspicion, the fact of relationship is unquestionably not fraud *per se,* and is is generally. held that a conveyance or transfer of property in good faith preferring a creditor who is the debtor's relation will be sustained, where the value of the property does not exceed the debt. * * *"

It appears that the creditors of Minnie Alice Marshall had a right to file a creditor's bill, adduce evidence, and obtain a decree as against the parties involved in these conveyances, if it can be shown they were made for the purpose of defrauding creditors. It is questionable whether or not the defendants to this suit are in a position to contend here that these conveyances were void *ab initio.* Section 5771, C. G. L.

In the case of Bay View Estates Corp. v. Southerland, 114 Fla. 635, 154 Sou. Rep. 894, it was said:

"The mere fact that a person may be indebted to another does not render a conveyance of his property a fraud in law upon his creditors. The owner of property whether real or personal possesses the absolute right to dispose of all or any part of his property as he sees fit. The only restriction imposed by law is that no transfer shall be made which will interfere with the existing rights of other persons. If the right of disposition is exercised to the injury or prejudice of other persons the courts will then interfere and the question arises whether the circumstances constituted *ipso facto* a fraud upon the complaining creditors or whether the alleged facts raise a presumption of fraud."

Likewise this Court held in the case of Kahn v. Wilkins, 36 Fla. 428, text p. 434, 18 Sou. Rep. 584, when it said:

"* * * It is an established rule of law that all deeds, conveyances and bills of sale, entered into for the purpose of defrauding creditors are valid between the parties, and such fraudulent conveyances vest title absolutely in the grantees and secure to them a perfect estate, except as to those persons actually defrauded by the transaction. Bellamy v. Bellamy, 6 Fla. 62; Whitworth v. Thomas, 83 Ala. 308, 3 South. Rep. 781; S. C. 3 Am. St. Rep. 725, and notes; Wait on Fraudulent Conveyances and Creditors' Bills, Sec. 395."

The rule enunciated in Kahn v. Wilkins, 36 Fla. 428, 18 Sou. Rep. 584, was reaffirmed in Volusia County Bank v. Bigelow, 45 Fla. 638, text p. 645, 33 Sou. Rep. 704, when the Court said:

"* * * As between the claimant and the defendant in execution the right of property might be in the former, while at the same time the property might be subject to execution against the defendant in execution. A grantee in a conveyance designed to defraud creditors acquires a good title as against the grantor, and yet such title is not good as against an execution against the former. Kahn v. Wilkins, 36 Fla. 428, 18 South. Rep. 584; Bellamy v. Bellamy, 6 Fla. 62; Mayer v. Wilkins, 37 Fla. 244, 19 South. Rep. 632."

A similar expression was made in the case of Watkins v. Watkins, 123 Fla. 267, text p. 271, 166 South. Rep. 577, when this Court said:

"This is a suit to establish a title already vested in the complainant as distinguished from one in which a reconveyance is sought. In Kahn v. Wilkins, 36 Fla. 428, 18 So. 584, this Court held that a conveyance between a fraudulent grantor and grantee is good as between the parties and vests title in the grantee, except as to those persons

actually defrauded. In the case before us no creditor is involved and none complain. As between the parties here involved none can be heard to complain that the transfer from John Barr Watkins and Carrie Watkins to Sue D. Barr and the alleged conveyance by Sue D. Barr to John Barr Watkins, Jr., was in fraud of creditors."

The record in this case shows that Minnie Alice Marshall and husband had dealt in real estate during the boom period and sustained losses and creditors were pressing their claims and obligations for payment and she nor her husband had or owned the property or money to pay and otherwise settle these claims, and they realized that ultimately the interest of Minnie Alice Marshall in the West 50 feet of the Poinsettia Hotel would be called upon to satisfy these outstanding boom day obligations. Her insolvency existed, no doubt, on October 24, 1928, when she executed a warranty deed to the S. & F. Holding Company, a corporation, and her financial affairs, according to the evidence had not improved on February 20, 1929, when the S. & F. Holding Company conveyed the West 50 feet involved in this suit to Mrs. May F. Fisher. There is nothing here showing activity on the part of the creditors of Minnie Alice Marshall to reach the property involved in this suit by suit or otherwise. Close relationship existed between the sisters and they appear as a family rather than individuals. The deed from Minnie Alice Marshall through the Corporation to her sister, Mrs. May F. Fisher, can be considered for all intents and purposes as a conveyance directly from one sister to another. It will be observed by the above authorities that as between these sisters and in the absence of an asserted claim on the part of a creditor, or creditors, of Minnie Alice Marshall, this conveyance is good and conveyed all interest then owned and possessed by the grantor into the plaintiff here.

We express no opinion as to the rights of creditors concerning the said conveyance.

Wait on Fraudulent Conveyance, Third Edition, treats the question of conveyances to relatives, and at par. 242, pages 434-7, says:

"242. Effect of Relationship upon Debtor's Transactions.—The cases relating to the effect of proof of relationship of parties dealing with the debtor are numerous. A clearly formulated rule on the subject is not possible. It is said by the Supreme Court of Pennsylvania that 'there is no law prohibiting persons, standing in near relations of business or affinity, from buying from each other; or requiring them to conduct their business with each other in special form.' The sale of property by a father to his son, or by the son to his father, cannot in itself be considered as a badge of fraud, and sometimes the strongest considerations of duty may prompt a son to prefer the claim of a widowed mother. The court may require a mother to show that she had the means to make advances as claimed to her son. 'The relationship of asssignor and assignee,' says Finch, J., 'and their intimacy and friendship, and the preference given to the latter as a creditor prove nothing by themselves. They are consistent with honesty and innocence, and become only important when other circumstances indicative of fraud, invest them with a new character and purpose, and transform them from equivocal and ambiguous facts into positive badges of fraud.' The majority of the cases hold that relationship of the parties, however, is calculated to awaken suspicion, and the transaction will be closely scrutinized, if there are any facts which tend to indicate fraud, though the relationship is not of itself sufficient to raise a presumption of fraud. It may be considered, with the other facts, by the jury, and rather tends to aid the creditors, for it is regarded as highly probable.

that a party intending to perpetrate a fraud would look for aid and connivance to a relative rather than a stranger. Still an instruction to a jury that a deed be given to a brother to secure a debt is *prima facie* fraudulent is erroneous. When relationship is coupled with secrecy in the transaction, it may, unless explained or justified, be regarded as fraudulent. The same rule applies when the transfer conveys the debtor's entire estate, and other badges accompany it. In some cases it is held that in transactions between relatives no clearer proof of good faith is required than in transactions between strangers. It may be observed here that the fact that the creditors who obtained judgments by confession bore intimate relations to the debtors, the delay in the levy of the execution, the usual time and order under which the assignee took possession, and the agency of the same attorney in all the proceedings, though, perhaps, casting suspicion upon the proceedings, are not in themselves sufficiently strong to sustain an imputation of bad faith, or a charge of fraudulent preference. We may here advert to the rule of the common law that a debtor has a right to prefer one class of creditors to another, and that it is error to encourage a jury to take into consideration the exercise of this right as 'a circumstance of suspicion in deciding upon the fairness of the transfer.'

"The case of Salmon v. Bennett has exerted a potent influence over decisions in this country concerning voluntary conveyances. In the course of the opinion SWIFT, C. J., said: 'mere indebtedness at the time will not, in all cases, render a voluntary conveyance void as to creditors, where it is a provision for a child in consideration of love and affection; for if all gifts by way of settlement to children, by men in affluent and prosperous circumstances, were to be rendered void upon a reverse of fortune, it would involve children in the ruin of their parents, and in many cases

might produce a greater evil than that intended to be remedied.' This rule has been applied to conveyances to wives, as well as to children, grandchildren, and other near relatives."

In line with previous decisions of this Court and in conformity with high authorities from other jurisdictions, we hold that as between the sisters the said conveyances were and are sufficient to convey all interest in and to said property to Mrs. May F. Fisher.

Defendants contend that from 1924 to September, 1933, he was the manager of the Poinsettia Hotel for the partnership. It is alleged that the partnership existed between Minnie Alice Marshall and May F. Fisher and was established under date of November 1, 1922. The partnership agreement embraces the property involved in this suit, with other property, and there can be no question as to the binding effect of the articles of partnership upon the parties thereto. There is no dispute about the operation of the hotel under the partnership agreement, or the employment of the defendant by the partnership, but there does exist a conflict as to the date of termination of the partnership agreement dated November 1, 1922. It is the contention of the defendant that his employment as manager of the Poinsettia Hotel ceased in September or October 1st, 1933. The defendant asserts that during the entire period of his employment he gave the best of his ability, dealt fairly and honestly, showed no favoritism, and applied the very best business principles known to him in the operation of the hotel. The parties to the partnership were untrained in business, indifferent as to investments, made no provision for the retirement of their obligations, extravagant in the expenditure of moneys, and it was difficult to get the business on a sound financial basis. It having been determined, *supra,* that all the interests owned by Minnie Alice Marshall

in and to the property involved in this suit were conveyed through a corporation to Mrs. May F. Fisher on February 20, 1929, and Minnie Alice Marshall retired therefrom, and as a matter of law the said conveyance dissolved the partnership established November 1, 1922. The record fails to show that Minnie Alice Marshall ever claimed an interest in the Poinsettia Hotel after the conveyance of her interest, and upon this theory the partnership existing dissolved as a matter of law on the date of the conveyance as between the sisters, while the defendant to this cause contends that he worked for the partnership from 1924 until September or October, 1933.

Let us examine the authorities and determine the existence of this partnership for whom the defendant claims to have worked from and after February 20, 1929, until September or October, 1933. It is is conceded generally that where one partner transfers or sells his entire interests in the partnership property and after the sale, withdraws, as a matter of law the partnership is dissolved. This Court, in the case of Schleicher, Schuum & Co. v. Walker, 28 Fla. 680, text p. 695, 10 Sou. Rep. 33, said:

"It is also settled that where one partner transfers his entire interest in the partnership concerns to his co-partner so as to vest in him the partnership assets as his sole property, a dissolution of the partnership results and the purchasing partner may as against any simple creditor of the partnership, assign the property thus vested in him as his sole property for the payment of his individual indebtedness. He can exercise the same dominion over it that he might over any other individual property. * * *"

Likewise, the same principle of law was reaffirmed in Durham v. Edwards, 50 Fla. 495, text p. 500, 38 Sou. Rep. 926, when this Court said:

"* * * Where one partner transfers his entire interest in the partnership concerns to his co-partner so as to vest in the latter the partnership assets as his sole property, a dissolution of the partnership results. * * *"

The same principle of law appears in Volume 20 R. C. L., par. 178, page 954:

"Withdrawal of Partner.—It is a fundamental principle that every change in the personnel of a firm works a dissolution, and that an existing partnership is terminated and a new partnership is formed whenever a partner retires, or a new one is admitted. A contract of partnership containing no stipulations as to the time during which it shall continue in force does not endure for the life of the partners, or of either of them, or for any longer time than their mutual consent. Such a partnership may be dissolved by the agreement of the members, or by the act of any partner alone proceeding in accordance with his own will and pleasure, and at a moment's notice. * * *"

Also 47 Corpus Juris, par. 780, page 1116:

"Sale by Partner of His Interest.—The dissolution of a partnership may be brought about by the sale of a partner's interest to a co-partner, or to a third person, unless otherwise provided by agreement, although there is some contrary authority; * * *"

Rowley on Modern Law of Partnership, Volume 1, par. 591, page 769:

"* * * But as a general rule, any change in the membership of a firm operates as a dissolution of the same and the formation of a new partnership. And by the weight of authority, the transfer of a partner's interest works a dissolution of the partnership, *ipso facto,* if a partnership at will and furnishes ground for dissolution by decree on application of a partner or the purchaser where the partner-

ship was for a fixed term, except, perhaps, when such a transfer is contemplated by the partnership agreement, but while in some cases it has been held that the formation of a corporation which takes over the business and all the assets of the firm works a dissolution of the partnership, the authorities do not, at first glance, speak as with one voice upon this subject."

It seems that the transfer of the interest of Minnie Alice Marshall on February 20, 1929, as a matter of law, dissolved the said partnership between the sisters and for whom the defendant claims he was working from 1924 until September or October, 1933. It is true that a decree of the court may have been necessary to have effected a legal dissolution, but as between the parties to the said partnership it ceased to exist and function in so far as it affects the defendant and his said employment as of February 20, 1929.

It now becomes necessary to consider the evidence to determine the relationship of Mrs. May F. Fisher and the defendant after February 20, 1929. Mrs. Fisher testified that defendant Grady managed the hotel, rented rooms, collected rents, deposited the money, signed checks, had charge of the business, supervised the bookkeeping, had full control of the money, "he was my general agent and looked after all my affairs." "He handled all my affairs, yes, and I trusted him to handle them." Defendant Grady testified he worked for the partnership until October, 1933, and was manager of the Poinsettia Hotel during the period, but was not an agent of Mrs. Fisher—"my position as manager of the hotel was a confidential relationship—I helped them at different times, but I never felt that I was acting as confidential agent. I helped all members of the family at different times. I tried to treat them both the same way and give them the best service. I was not agent, but manager of the hotel. I paid the operating expenses and did what I

was told to do." He received $50.00 per week and $1,000.00 per annum and drew his salary until October, 1933, but had not received salary in full. He was there twelve years; he negotiated and closed business items for Mrs. Fisher. "I was Jack of all trades, I might say, for all of them"—"they called on me for anything from a flood to a fire, a lawsuit or anything else, it did not make any difference which member of the family it was they would seek me out to see if I could be of some assistance." "I might add that if any one of the family got into trouble I seemed to be the first individual they looked for."

Defendant Grady stated he was stripped of power as agent when Mrs. Fisher gave a power of attorney to her brother. The evidence fails to support this statement. Counsel for both parties admitted Grady managed the hotel from 1924 until October, 1933. Defendant asserts he managed it as agent for the partnership, while she, plaintiff, contends he managed it for her. That relation of principal and agent existed between Mrs. May F. Fisher and the defendant, Don Grady, is fully sustained by the evidence. It having been established by the evidence that the defendant was the agent of the plaintiff, let us determine his duty under the law. Volume 3, page 7, par. 138, of Corpus Juris Secundum, it was said:

"This principle is sedulously applied and an agent's acts which tend to violate his fiduciary duty are considered in the light of fraud upon confidence bestowed, and are not only invalid as to the principal, but are also against public policy. In the absence of proof to the contrary, however, the presumption arises that an agent has performed his duty in good faith, and the principal, until notice is received of a breach of relational duties, may rely upon his agent's faithfulness."

Volume 2, pages 203-4, par. 252, of American Jurisprudence, it was said:

"Agent as a Fiduciary; Duty of Good Faith and Loyalty. —It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency. This is a rule of common sense and honesty as well as of law. Any custom subversive of this principle must be deemed to be unreasonable, opposed to the policy of law, and hence of no effect. Indeed, it has been stated that in the usual case, it is the duty of the agent to further his principal's interests even at the expense of his own in matters connected with the agency. But no presumption of fraud will be deemed to arise against an agent unless it appears that he has personal interests conflicting with those of the principal."

The Supreme Court of Florida in the case of City of Coral Gables v. Coral Gables, Inc., *et al.,* 119 Fla. 30, text p. 37, 160 Sou. Rep. 476, in treating of agency, said:

"No principle of law is better settled than that the same person cannot act for himself and at the same time with respect to the same matter as the agent of another whose interests are conflicting. The two positions impose different obligations and their union would at once raise a conflict between interest and duty and, constituted as humanity is, in the majority of cases duty would be overborne in the struggle. March v. Whitmore, 21 Wall. (U. S.) 178, 22

L. Ed. 462; San Diego v. San Diego & Los Angeles R. Co., 44 Cal. 106; Lainhart v. Burr, 49 Fla. 315, 38 So. 711. This was the rule at common law.   Drake v. Elizabeth, 69 N. J. L. 190, 54 Atl. 248; Stubbs v. Florida Finance Co., · 118 Fla. 450, 159 So. 627."

There is a similar utterance in the case of Fulton v. Clewiston, Limited, 100 Fla. 257, text p. 265, 129 Sou. Rep. 773:

"Likewise it had been held and may be considered as the established doctrine in this jurisdiction that when the relation of principal and agent exists the principal is entitled to all the skill, ability and industry of which the agent is capable in his principal's interest and the exercise of the utmost of good faith on the part of the agent toward his principal to the end that the principal, not the agent, may benefit by the work to be accomplished.   See Boswell v. Cunningham, 32 Fla. 277, 13 So. R. 354; Burnham City Lumber Co. v. Rannie, 59 Fla. 179, 52 So. R. 617.

"The existence of such a fiduciary relation as that of principal and agent precludes the latter from taking advantage of his employer or to use any knowledge acquired by such relation to his injury and the personal pecuniary advantage of the agent at his employer's expense. * * *"

Likewise, in Connelly v. Special Road & Bridge District No. 5, 99 Fla. 456, 126 Sou. Rep. 794, it was said:

" 'The well settled and salutary principle that a person who undertakes to act for another shall not, in the same matter, act for himself, results also in the other rule that all profits made and advantage gained by the agent in the execution of the agency belong to the principal.   And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent, if it be the fruit of the agency.' "

This Court has, from time to time, considered and de-

termined facts which in law amount to a resulting trust. The evidence here shows that defendant Grady entered into a written agreement with N. U. Bond wherein he was to furnish the necessary money to buy bonds covering the West 50 feet, and, pursuant to the agreement, the bonds were purchased at a reduced price and the mortgage foreclosed and N. U. Bond bought the property at Master's sale and on the following day conveyed the property to the defendant and took back a purchase price mortgage in the sum of $33,000.00 and at the same time the defendant Grady was managing the hotel for the plaintiff, and she had no knowledge or information about the transaction—she was around seventy years of age, a widow—in bad health, and depended upon her nephew, the defendant, to care for her interest, which he had been doing for approximately twelve years. Under these circumstances, what was the defendant's duty to the plaintiff? In the case of Quinn v. Phipps, 93 Fla. 805, text p. 813-14, 113 Sou. Rep. 419, this Court said:

"A constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. Constructive trusts arise purely by construction of equity independently of any actual or presumed intention of the parties to create a trust and are generally thrust on the trustee for the purpose of working out the remedy. They are said to arise from actual fraud, constructive fraud and from some equitable principle independent of the existence of any fraud. 26 R. C. L. 1232.

"In discussing the circumstances that give rise to a constructive trust, Perry, on Trusts (6th Edition) par. 166, page 260, has the following pertinent comment:

" 'If a person obtains the legal title to property by such

arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation, and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity in order to administer complete justice, between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. Such trusts are called *constructive* trusts. They differ from other trusts in that they are not within the intention or contemplation of the parties at the time the contract is made from which they are construed by the court, but they are thrust upon a party contrary to his intention and against his consent. The reason is that courts of equity have a large jurisdiction over all matters of trusts and confidence. They control and direct their administration and in certain cases they annul and put an end to them by directing the trustee to convey the trust property to the person beneficially interested.'

"From an examination of the text-books and many English and American cases touching this question, the law seems well settled that a court of equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means gains something for himself which in equity and good conscience he should not be permitted to hold."

Likewise in Clark v. Johnson, 91 Fla. 485, text page 487, 107 Sou. Rep. 636, it was said:

"One who assumes the position as agent of the owner

for the purpose of paying taxes for the owner cannot while occupying such status allow the property to sell for taxes and acquire a tax deed under a certificate of sale, so made, which will convey a valid title as against the owner or his successors in title. A deed so obtained is fraud against the owner or his successor in title."

In the case of Dale v. Jennings, 90 Fla. 234, text p. 243, 107 Sou. Rep. 175, the equity powers of a court were considered when it was said:

"The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed."

There is a similar rule in Thomas v. Goodbread, 78 Fla. 278, text p. 287, 82 Sou. Rep. 835, where this Court said:

"In addition to these decisions of this Court the adjudicated cases generally hold that where one buys land at a judicial sale under a parol agreement to purchase for another and fails to convey according to the agreement, a constructive trust arises where the promisee furnished the pur-

chase money, or had an actual interest in the estate, or a *bona fide* claim thereto. * * *"

The rule for determining the weight and sufficiency of the evidence in establishing a resulting trust has been settled in this Court for approximately fifty years. In the case of Loftin v. Sterrett, 23 Fla. 565, 2 Sou. Rep. 837, it was held that a resulting trust in real estate may be proved by parol testimony, but such proof must be full and clear. Likewise in the case of Geter v. Simmons, 57 Fla. 423, 49 Sou. Rep. 131, it was said:

"Evidence to establish a resulting trust must be so clear, strong and unequivocal as to remove from the mind of the Chancellor every reasonable doubt as to the existence of a trust."

Also in the case of Brown, *et al.,* v. Brown, 106 Fla. 423, text p. 426, 143 Sou. Rep. 737, this Court said:

"When a resulting trust is sought to be established by parol evidence the burden rests upon the person asserting the existence of the trust to remove every reasonable doubt as to its existence by clear, strong and unequivocal evidence. Fox v. Kimball, 92 Fla. 401, 109 Sou. Rep. 465; McGill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836; Semple v. Semple, 90 Fla. 7, 105 South. Rep. 134; Johnson v. Sherehouse, 61 Fla. 647, 54 South. Rep. 892."

Plaintiff acquired title to the West 50 feet on February 20, 1929, and defendant Grady, since 1924, had been in charge of the property. Mrs. Fisher's health grew worse until she went to the hospital in 1931 and later to the mountains of North Carolina, whence she returned during the late Summer or early Fall of 1932. It was then they discussed a refinancing of the West 50 feet, and all agreed that it would require $40,000.00 to carry out their plans. The defendant assisted plaintiff in working out an agreement

with the Bondholders' Committee by the acceptance of rents as to the East 113 feet, when all the negotiations were handled by defendant. Plaintiff contacted an individual whom she thought and believed would furnish the $40,-000.00 to finance the West 50 feet, and had reasons to think and believe she could get the money, but the defendant entered into a written agreement with Senator N. U. Bond to furnish the money, arranged for the foreclosure to be instituted and in August prior to October, 1933, defendant Grady sent statement and release to Mrs. Fisher as to the West 50 feet and requested her signature to same in the presence of two witnesses. The sum of $2,899.27 was delivered to Judge Viney while the defendant at the time was acting agent of the plaintiff. It seems that all parties having business dealings with Mrs. Fisher, contacted her through the defendant Grady about the property in question. Defendant Grady told Mrs. Fisher it was necessary "to run these bonds through the wringer," meaning to buy them at a discount, foreclose and obtain a Master's deed to the property. The defendant Grady at no time or occasion by appropriate action or by an instrument in writing advised Mrs. May F. Fisher that he was not in her employ in refinancing the property, arranging for the foreclosure and in taking title to the property.

It is true that defendant Grady stated that he had a joint conference with Mrs. Fisher and Mrs. Marshall when he advised them that he could not continue the management of the hotel and the same was lost and the sisters consented that he salvage something from the loss, and from the date of this conference he asserts that the relation of principal and agent terminated. It is regrettable that there is not some instrument in writing expressing the terms of the agreement, properly witnessed and signed, wherein each detail about the property was fully set forth. The verbal agreement

relied upon by the defendant was contrary to the acts and doings of the plaintiff at all times and to dispose of valuable property in such a manner is not the custom of the average business man or woman. It is impossible to set out in this opinion all the evidence adduced as the record is large, with approximately one hundred exhibits, with lengthy and able briefs filed on part of counsel for the parties.

We have not overlooked the many authorities cited by counsel for defendant to the effect that an appellate court cannot reverse the findings of a Chancellor on facts unless it has been made to appear that the findings are clearly erroneous when considering all the evidence. See: Holland v. Evans, 113 Fla. 839, 152 Sou. Rep. 623, appearing in defendant's brief as follows:

" '(1) The case presents a question of the sufficiency of the evidence to support the chancellor's findings. A rule which this Court has observed from its earliest history is that a chancellor's finding and conclusion on facts will not be disturbed unless the evidence shows clearly that such finding and conclusions are erroneous. See Waterman v. Higgins, 28 Fla. 660, 10 So. 97; Fuller v. Fuller, 23 Fla. 236, 2 So. 426; Lewter v. Price, 25 Fla. 574, 6 So. 439; Bothamly v. Queal, 58 Fla. 396, 50 So. 415; Viser v. Willard, 60 Fla. 395, 53 So. 501; Theisen v. Whiddon, 60 Fla. 372, 53 So. 642; Bank of Jasper v. Tuten, 62 Fla. 423, 57 So. 238; Dixon Lumber Co. v. Jennings, 63 Fla. 405, 57 So. 615; Terra Ceia Estates v. Taylor, 68 Fla. 261, 67 So. 169; McGill v. Chappelle, 71 Fla. 479, 71 So. 836; Farrell v. Forest Inv. Co., 73 Fla. 191, 74 So. 216; 1 A. L. R. 25; Hill v. Beacham, 79 Fla. 430, 85 So. 147; Sandlin v. Hunter, 70 Fla. 514, 70 So. 553; Shad v. Smith, 74 Fla. 324, 76 So. 897; Edney v. Stinson, 90 Fla. 335, 105 So. 821.

" '(2) Where the evidence is conflicting, the finding of

the chancellor will not be disturbed unless such finding is clearly shown to be erroneous, is a mere corollary to the rule announced above, because the chancellor must consider the evidence, weigh its probative value, and determine from the spoken words of the witnesses and such documents as are offered in evidence the truth of the given proposition under consideration by him. If the finding which he makes from the conflicting statements of witnesses is to be disturbed, it must be because the evidence considered in its entirety is clearly irreconcilable with the conclusion reached by him.'"

In the administration of the law it becomes the duty of this Court to reverse the decree appealed from as we do not think or believe substantial justice was awarded in the court below. The Declaration of Rights of the Constitution of Florida, as provided in Section 4, reads:

"All courts in this State shall be open, so that every person for any injury done him in his lands, goods, person or reputation shall have remedy, by due course of law, *and right and justice shall be administered, without, sale, denial or delay.*" (Emphasis supplied.)

Considering the entire record we feel that substantial justice and right, as provided *supra,* require the granting and entry of a final decree in accordance with the prayer of the bill of complaint by the lower court. The decree appealed from is hereby reversed for further proceedings in the lower court not inconsistent with this opinion.

It is so ordered.

WHITFIELD, P. J., and BROWN, J., concur.

TERRELL, J., concurs in the opinion and judgment

BUFORD, J., dissents.

ELLIS, C. J., not participating.

BUFORD, J. (dissenting).—I am very much impressed with the able opinion prepared by Mr. Justice CHAPMAN in this

case and if the decree of the court below had reflected the conclusion which has been reached by the majority of this Court, I should have had no hesitancy in agreeing to an affirmance.

In such cases as this the findings, orders and decrees of a referee are entitled to the same consideration, weight and dignity of standing as are the findings, orders and decrees of a Chancellor.

There can be no doubt that long prior to and during the period of time during which the transactions here involved transpired Mr. Grady occupied a fiduciary relation with the complainant which in law required his absolute loyalty to her and preclued his acquiring any interest in the property involved against her interest without her full knowledge and consent so to do. See Quinn v. Phipps, 93 Fla. 805, 113 Sou. 419.

If Mr. Grady acted in acquiring the title to the property involved in his own right with the full knowledge and consent of the complainant that he should do so then no fiduciary relation existed which would result in the title to the property involved being vested in him in trust for the use and benefit of the complainant.

The presumption of the existence of constructive trusts I think may be rebutted when fiduciary relations shall have been shown to exist just as the existence of a resulting trust as a presumption of law may be rebutted.

In Fox v. Kimbal, 92 Fla. 401, 109 Sou. 465, it was held:

"In Jackson, *ex dem,* Feller v. Feller, N. Y. 2nd Wendell 465, it was held, 'A *resulting* trust may be rebutted by *parol* proof that the lands in which the estate is claiming were a gift and advancement to the grantee, and were not purchased for the benefit of the party paying the consideration money' and this continues to be the view of the Courts in this country.

"In Lewis on Trusts, Vol. 1, Eighth Edition, page 233, the writer says: 'When it has once been ascertained that the understanding of the parties at the time of the purchase was that the legal owner should also be the beneficial owner, it is not competent for the person who paid the money to put a different construction upon the instrument at any subsequent period, and claim the estate against his intentions at the time (a) ; and even if under such circumstances the legal tenant agreed afterwards to execute a conveyance to the person who paid the money, the Court would not enforce the contract, if merely voluntary (b).'

"In Dudley v. Bosworth, 10 Humphreys Tenn. 9-51 Am. Dec. 690, the Court says: "WHETHER CONVEYANCE TAKEN IN THE NAME OF ANOTHER THAN THE PERSON PAYING THE CONSIDERATION is an advancement to such other, or a resulting trust is created, depends upon the character of the transaction at its inception.'

"Resulting trusts may be rebutted by parol declarations of the persons in whose favor it would otherwise be raised."

The evidence was conflicting as to whether or not Mr. Grady in the transaction involved acted in his own behalf with the full knowledge and consent of the complainant. It appears to me that only on the theory that he so acted could the referee have reached the conclusion which he did reach.

I am not convinced that it is made to clearly appear that the referee committed error.

## ON REHEARING.

PER CURIAM.—On petition for rehearing it is made to appear that the judgment appearing at the conclusion of the opinion filed in this cause on December 23, 1937, should be amended so as to read as follows:

Considering the entire record we feel that substantial justice and right, as provided *supra,* require the granting and entry of a final decree in accordance with the prayer of the bill of complaint by the lower court, requiring the said Grady to make and render to the said Fisher a full, true and correct accounting for all moneys which have come into his hands by reason of his possession and control of the property involved in this suit, being allowed to take credit for such reasonable sums as may be allowed by the Chancellor as operating expenses, including his own just and reasonable compensation, and for all sums shown to have been reasonably and prudently expended by the said Grady for permanent betterment, furnishings and improvements, and requiring him to pay over the balance of such funds to the said Fisher; and that the decree adjudicate that the note and mortgage executed by Don B. Grady to N. U. Bond for the sum of $33,000.00 be the obligation, note and mortgage of the said Fisher, and requiring the said Fisher to pay off and discharge such note and mortgage and all interest thereon as and when the payments thereof shall become due and payable, or sooner if agreeable to the holder of such note and mortgage.

The decree appealed from is hereby reversed for further proceedings in the lower court not inconsistent with this opinion.

So ordered.

Rehearing denied.

ELLIS, C. J., and WHITFIELD, BROWN, BUFORD and CHAPMAN, J. J., concur.

TERRELL, J.—On examination of the record in the light of the petition for rehearing, I agree to the per curiam order filed herein, but in equity I think it should go further and provide an equal right or interest for the appellant and ap-

pellee in and to whatever remains of the *res* after the accounting.