MYRON I. STONE, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stone v. Commissioner
Docket No. 25661-81.
United States Tax Court
T.C. Memo 1984-650; 1984 Tax Ct. Memo LEXIS 24; 49 T.C.M. (CCH) 314; T.C.M. (RIA) 84650; December 17, 1984. Albert D. Greenfield, for the petitioner. Julian A. Fortuna, for the respondent. RAUM MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined that petitioner is liable to the extent of $120,780.95, as transferee of assets of his parents, in respect of their Federal income tax liabilities for 1958 through 1965. Petitioner does not challenge the deficiencies and additions to tax against the transferors; the only issue is whether he is liable as a transferee pursuant to section 6901, I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner, Myron I. Stone, resided in Thousand Oaks, California, at the time he filed his petition herein. *25 He earned a Bachelor of Arts degree from the University of Miami and has teaching credentials from the States of Florida and California. He was born on February 22, 1937, and has never married. Petitioner is the son of Dr. S. Montague Stone and Lee Stone, who were born on January 3, 1907, and March 14, 1910, respectively. He resided with his parents for a substantial portion of his adult life. He lived with them in Florida after graduating from college in 1958 until sometime in 1965 when all three moved to California. They stayed together in California for about a year and a half at which time the elder Stones returned to Florida. Sometime in 1978, Dr. and Mrs. Stone went back to California where they resided with petitioner and another son in petitioner's home. The father died on December 1, 1983, and the mother continues to reside with petitioner. On April 13, 1969, Dr. Stone, a practicing physician, was convicted in the United States District Court for the Southern District of Florida of willfully attempting to evade income tax for the taxable years 1962, 1963, and 1964. The Fifth Circuit affirmed this conviction. United States v. Stone,431 F. 2d 1286 (5th Cir. 1970), *26 cert. denied 401 U.S. 912 (1971). Subsequently, this Court found both parents liable for income tax deficiencies for the taxable years 1958 through 1965 and found Dr. Stone liable for additions to tax for fraud under section 6653(b), I.R.C. 1954, for those tax years. Stone v. Commissioner,T.C. Memo 1977-147, 36 T.C.M. 621, 46 P-H Memo T.C. par. 77,147 (1977). The decision of this Court has become final, and the parties agree that petitioner is estopped from contesting the deficiencies and additions for fraud determined therein. Based upon the findings in Stone v. Commissioner,supra, the Commissioner, on January 20, 1978, made assessments for taxable years 1958 through 1965 against Dr. and Mrs. Stone for income taxes in the amount of $116,828.54, plus statutory additions, and against Dr. Stone for additions to tax for fraud in the amount of $58,414.30. No part of these assessments in the aggregate amount of $175,242.84 plus interest has been paid. At the time of the January 20, 1978, assessments, Dr. and Mrs. Stone were still residing in Florida. One of them told petitioner during a transcontinental telephone conversation that *27 he would be receiving "some papers" which he should sign and return. Petitioner was not informed of the nature of the "papers". When the "papers" arrived, he learned that they consisted of two agreements, one between him and his father, and the other between him and his mother. Each parent purported to "sell" certain assets to petitioner in exchange for an annuity to be paid by petitioner to the respective parent. The assets thus "sold" or transferred to petitioner consisted of four items of property, three of which were owned jointly by both parents, and the fourth solely by Dr. Stone. Each parent transferred his or her entire share of these assets to petitioner. The four items consisted of (1) a $20,000 interest bearing note payable to Dr. Stone, having a stated unpaid balance of $11,262.21; (2) a $31,240 interest bearing note payable to Dr. and Mrs. Stone, having a stated unpaid balance of $6,747.84; (3) 100 units of interest in a Municipal Investment Trust Fund owned jointly by Dr. and Mrs. Stone, having a stated then current value of $80,770.50; and (4) certain lots in Highlands County, Florida, having an estimated market value of $22,000. In consideration of *28 the transfer of their respective interests in these assets by Dr. and Mrs. Stone (sometimes hereinafter referred to as the "transferors"), petitioner purported to obligate himself to pay $9,930.86 a year to his father and $6,451.82 a year to his mother for their respective lives, the first such payments to be made February 15, 1979, and the remaining payments to be made February 15 of each succeeding year. By using the tables in the regulations of the Internal Revenue Service for valuing annuities based upon the life expectancy of the annuitant and an assumed rate of interest, the amount of the annual payments to the transferors was determined in such manner as to equate the value of the annuities with the value of the assets transferred by them to petitioner. Petitioner signed the two foregoing annuity agreements, which were dated January 30, 1978, 10 days after the assessments against Dr. and Mrs. Stone reflecting the deficiencies determined against them by this Court. Prior to signing the agreements petitioner had no negotiations or discussions whatever with his parents or anyone else about them. Although he read the agreements before signing them and understood what *29 they purported to do, he in effect merely did what was expected of him in respect of the "papers" that he had been told he would receive in the mail. He was aware that his father had a "tax problem". Albert D. Greenfield, petitioners' counsel herein and counsel for Dr. and Mrs. Stone in the proceedings in this Court in which their tax liability was adjudicated, was the mastermind of the plan involving the annuities. At the time of the transfer by Dr. and Mrs. Stone to petitioner, the transferred assets had a stipulated total fair market value of $120,780.55, the amount involved herein, and were the only significant assets then owned by the transferors. The transferors were left without sufficient funds or property to discharge the income tax liabilities assessed against them, and were insolvent. In a statement dated May 17, 1978, which they submitted to the Internal Revenue Service, they represented that their only assets amounted to $410, and they listed among their assets a "Future annuity" upon which they placed a value of "O". That statement also showed that they had "other liabilities" in the amount of $13,718.59. The efforts on the part of the Commissioner to *30 collect any portion of the assessments from the transferors have been fruitless, and any further effort to collect from them would be a useless gesture. At no time, from the date of the transfer in 1978 until the present, did petitioner ever make the annual February 15 payments of $9,930.86 and $6,451.82 purportedly required by the so-called annuity agreements. However, he did turn over to his parents the income that was generated by the transferred assets. Thus, as monthly payments were received from the makers of the notes and from the Municipal Investment Trust Fund, petitioner would endorse the checks, cash them, and immediately deliver the proceeds to his parents. In 1978 such checks amounted to $874.76 a month, but the record does not disclose when in 1978 petitioner began to receive the checks, and we cannot find that he received such checks and paid over the proceeds to his parents during the entire year 1978. [1] During 1979 and for the first eight months of 1980, petitioner continued to receive checks aggregating $874.76 a month, the proceeds of which he delivered to his parents. In August 1980, the last of the two notes was paid off, leaving the investment in the Municipal *31 Investment Trust Fund as the only remaining transferred asset that was productive of current income. The checks from that source amounted to $474 each month, the proceeds of which petitioner faithfully and promptly paid over to both his parents until the death of his father in December 1983 and since then to his mother. He has made no other payments to his parent-transferors purportedly under the agreements. When the annuity agreements were executed in January 1978, petitioner's total assets were about $10,000 to $12,000, consisting primarily of a current model automobile and about $5,000 or $6,000 in securities. He would then have been wholly unable to make the annual payments purportedly required by the agreements, and after the transfers he was in substance no more than a conduit for passing on to his parent-transferors the income generated by the transferred assets. OPINION The Government became a creditor of Dr. and Mrs. Stone in respect of their income tax liabilities for the years 1958 through 1965, and the amount of its claim was fixed by the assessments *32 made on January 20, 1978, after criminal and civil litigation in which the Government's position was persistently and unsuccessfully resisted. We are now faced with a further effort to defeat the Government's rights by means of a cynical scheme devised by their attorney, who is also the attorney for their son, the petitioner herein. Only some ten days after the January 20, 1978, assessments were made, the Stones transferred virtually all of their assets to their son, obviously attempting thereby to frustrate the Government's ability to collect upon its claim against them. In order to create the illusion of a bona fide transaction, the transfers were cast in the form of two agreements whereby the Stones purported to "sell" the assets to their son, who in turn purported to pay therefor by obligating himself to make annual installment payments over his parents' respective lives. The amounts of such annuity payments were cleverly computed in accordance with appropriate mortality tables so as to make it appear that each transferor was receiving full and adequate consideration for the assets transferred. It is our judgment that there was never any intention that the so-called *33 annuity agreements would be carried out in accordance with their terms, that there was no intention that petitioner would make the annuity payments to his parents specified in the agreements, and that the purported full and adequate consideration was merely a sham. We so find as a fact. From the very beginning, the income which was generated by the transferred assets and which petitioner turned over to his parent-transferors bore no relationship whatever to the annuity payments purportedly required of him by the agreements. It would put too great a strain on our credulity to believe that the course of action actually followed immediately after the transfers was not in accordance with the understanding and expectations of all concerned. In proceeding against petitioner as transferee of the taxpayers' assets, the Commissioner acted under the provisions of section 6901, I.R.C. 1954. It is well established that those provisions do not create transferee liability, but merely make available to the Commissioner procedural machinery to pursue the Government's claim against a transferee, and that the Government's rights as a creditor against the transferee must be determined *34 under applicable state law. Commissioner v. Stern,357 U.S. 39 (1958); Phillips v. Commissioner,283 U.S. 589 (1931). The parties are in agreement that the applicable state law here is that of Florida. After examining Florida law, we are satisfied that the transfers before us were fraudulent within Florida standards, and that there is ample basis for the Government's claim as a creditor under the law of that state against petitioner to the extent of the assets transferred to him. In United States v. Fernon,640 F. 2d 609 (5th Cir. 1981), the Court of Appeals considered Florida law in a case that was similar in many respects to the case now before us. There, as here, the transferors, parents of the transferee, conveyed certain property to their son at a time when they were liable to the Government as a creditor for tax deficiencies. The property was valued at $40,000 when transferred to the son, who then created a tenancy by the entirety for himself and his wife in respect of the property. The parents died subsequently, and there were apparently no remaining assets to satisfy the claim for taxes. Thereafter, the son *35 and his wife sold the property for $75,000. In a suit brought against them by the United States to collect on the Government's assessments for taxes against the parents, the Fifth Circuit approved the decision of the District Court holding them liable to the extent of the value of the property at the time of transfer, $40,000, in reliance upon the provisions of Fla. Stat. Ann. section 726.01, the very Florida statutory provisions that are involved herein. [2] We quote at length from the opinion of the Court of Appeals affirming the District Court (640 F. 2d, supra. 613): Finally, we will now examine the real heart of this appeal: whether the 1965 conveyance was made in fraud of creditors. "To constitute a fraudulent conveyance, there must be a creditor to be defrauded, a a debtor intending fraud, and a conveyance of property which is applicable by the law to the payment of the debt due." Bay View Estates Corp. v. Southerland,114 Fla. 635, 650, 154 So. 894, 900 (1934). Obviously the Government stood as a creditor for purposes of collecting the tax deficiencies previously discussed. Moreover, the * * * property would be subject to the payment of this debt. *36 * * * Therefore, only the second requirement, which is one of the aforementioned three that must be shown to exist under Florida law in order to establish the appellants' liability * * * remains for our consideration. "A fraud upon creditors consists in the intention by the debtor to prevent his creditors from recovering their just debts by withdrawing his property from the reach of his creditors. . . . As the fraud rests upon the debtor's intent, it must exist at the time of the transfer." Southerland,114 Fla. at 650, 154 So. at 900. This intention can be found by the existence of certain indicia or badges of fraud. Cleveland Trust Co. v. Foster,93 So. 2d 112, 114 (Fla. 1957). These involve the following considerations: (1) lack of consideration for the transfer, Gyorok v. Davis,183 So. 2d 701, 703 (Fla. App. 1966); (2) close family relationship between the transferor and the transferee, Fisher v. Grady,131 Fla. 1, 14, 178 So. 852, 858 (1937); (3) pending or threatened litigation against the transferor, Money v. Powell, 139 So. 2d 702, 704 (Fla. App. 1962); and (4) insolvency or *37 substantial indebtedness of the transferor, Banner Construction Corp. v. Arnold,128 So. 2d 893, 896 (Fla. App. 1961). "[W]hile a badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable." Id. at 896. The various conditions supporting transferee liability under Florida law considered above by the Court of Appeals are fully satisfied here. Here, as there, the United States is a creditor and the property transferred was subject to the payment of the transferors' debt. Moreover, we have no doubt as to the existence of fraud. All of the criteria for establishing fraud are present here. As to the first of those criteria, *38 lack of consideration, we have already found that the purported consideration ("annuity payments") was a sham. From the very beginning, petitioner was merely a conduit for delivering to his parents the proceeds of the periodic checks reflecting the income generated by the transferred assets. He paid nothing more pursuant to the annuity agreements. Indeed, the retention of beneficial use of the property after the transfer has itself been regarded by the Florida courts as an indication of a fraudulent conveyance. Temple Terrace Assets Co., Inc. v. Wason,163 So. 72, 75 (Fla. 1935); Jones v. Wear,149 So. 345, 348 (Fla. 1933); Charles Ringling Co. v. Muirheid,133 So. 108, 109 (Fla. 1931); Volusia County Bank v. Vertola,33 So. 448, 449 (Fla. 1902). The alleged consideration here was nothing more than "feigned consideration" that is specifically taken into account by the Florida statute (n. 2, supra). The other criteria for fraud under section 726.01 of the Florida statute are also present here. There is here the close family relationship between the transferors and transferee, the insolvency of the *39 transferors, and the "threatened litigation" against the transferee. As to the last item, the Commissioner had already made the assessments against the transferors, [3] and plainly the transferors had every reason to believe that steps would be taken to collect upon those assessments, including litigation if necessary. Fraud, of course, depends upon intent, which is a subjective matter. But intent generally cannot be established by direct evidence, and must ordinarily be inferred from all the evidence. In the present case, we find that evidence compelling, and we find that there was here present the fraud required by the Florida statute, as construed by the Florida courts. *40 The transaction before us involves a fraudulent transfer craftily contrived so as to masquerade as a bona fide sale for full and adequate consideration. It represents nothing more than a further persistent effort to cheat the United States after the unsuccessful determined and tenacious resistance to charges of fraud in respect of the underlying tax liabilities in both the criminal and civil cases that preceded the assessments. Those cases reeked of fraud. The same can be said of the present case. Decision will be entered for the respondent.
Footnotes
1. The record does indicate that in December 1978, there was an unexplained one time payment of $6,451.82.↩
2. Fla. Stat. Ann. sec. 726.01 provides in part: Every * * * conveyance, transfer * * * of lands * * * and every bond, note, contract * * * made * * * [in] fraud * * * to delay, hinder or defraud creditors * * * shall be * * * deemed * * * utterly void * * * any pretense, color, feigned consideration * * * to the contrary notwithstanding.↩
3. In this respect, the present case is stronger for the Government than United States v. Fernon,640 F. 2d 609↩ (5th Cir. 1981). There, the transfer was made in 1965 (even prior to the end of one of the tax years involved), and the assessment was made in 1968. Thus, notwithstanding that the Court indicated doubt about the presence of the "threatened litigation" factor in that case, it nevertheless approved the finding of fraud based merely upon three of the four designated factors.